**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

v.

**EUROBOND EXCHANGE, LTD., Defendant,**

and

**Gerald L. Rogers, aka J.K. Glenn, Defendant–Appellant.**

No. 91–55717.

United States Court of Appeals, Ninth Circuit.

Submitted Feb. 1, 1993.*

Submission Deferred March 1, 1993.

Resubmitted June 21, 1993.

Submission Withdrawn Aug. 24, 1993.

Resubmitted Oct. 25, 1993.

Decided Jan. 7, 1994.

---

* The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed.R.App.P. 34(a) and Ninth

Gerald L. Rogers, in pro per.

Brian D. Bellardo and Susan B. Mann, Sr. Counsel, S.E.C., Washington, DC, for plaintiff-appellee.

Sara Criscitelli, Associate Director, Office of Intern. Affairs, Dept. of Justice, Washington, DC, for amicus curiae.

Before: PREGERSON, LEAVY, and TROTT, Circuit Judges.

LEAVY, Circuit Judge:

The Securities and Exchange Commission ("SEC") brought this action against Gerald L. Rogers, president of the defendant Eurobond Exchange, Ltd. ("Eurobond"), for violations of anti-fraud and registration provisions of the federal securities laws. The complaint charged Rogers with violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77e(a) and 77e(c); the anti-fraud provisions of Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a); and the anti-fraud provisions of Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Commission Rule 10b–5, 17 C.F.R. 240.10b–5. The complaint sought a permanent injunction and disgorgement of Eurobond's profits.

The SEC maintained that the investment program whereby Rogers sold to American citizens certain interest-bearing treasury bonds issued by foreign governments, purchased in large part with foreign currency loans carrying much lower interest rates than those received on the bonds, was an investment contract. The SEC claimed that Rogers violated federal securities law by not registering the investment program pursuant to sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77e(c) (1988). The SEC also contended that Rogers made material misrepresentations and omissions in the sale of the bonds because he purchased bonds other than those advertised in Eurobond's sales materials; he sent false confirmation statements; he listed non-existent bonds; and he failed to reveal that he was a felon convicted of fraud and a fugitive from justice.

The SEC and Rogers filed cross motions for summary judgment. Rogers also moved to dismiss for lack of jurisdiction on the ground that an extradition treaty between the United States and Switzerland barred this action. The district court granted the SEC's motion for summary judgment and denied Rogers' motions for summary judgment and to dismiss. The district court entered final judgment against Rogers, ordering him to disgorge $1.6 million he derived from the investment program plus prejudgment interest of approximately $172,000. The court permanently enjoined Rogers from violating the applicable provisions of the federal securities laws.

Rogers timely appealed. At issue on appeal are: (1) whether the extradition treaty between the United States and Switzerland bars this civil action; and (2) whether the investment program is an investment contract which must be registered under the applicable securities laws.

## DISCUSSION

I. *Whether the Extradition Treaty Between the United States and Switzerland Bars This Civil Action* [1]

Rogers argues that the federal courts lack jurisdiction because Article IX of the Treaty for the Extradition of Criminals of May 14, 1900, between the United States and Switzerland, 31 Stat. 1928, T.I.A.S. No. 354, provides that:

No person surrendered by either of the Contracting States to the other shall be prosecuted or punished for any offense committed before the demand for extradition[.]

Article IX incorporates the doctrine of specialty. "As a matter of international comity, the doctrine of 'specialty' prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed

---

1. Rogers was never formally extradited. Instead, he waived extradition when he was arrested in Switzerland in January of 1990. According to the Office of International Affairs of the Criminal Division of the Department of Justice ("OIA"), the Swiss state that extradition under

this simplified procedure has the same effect as a formal extradition. Supplemental Brief of the Securities and Exchange Commission In Response To The Court's August 24, 1993 Order, at 2; Declaration of Mary Jo Grotenrath, Associate Director of the OIA, at 2, para. a.

to extradite." *United States v. Khan,* 993 F.2d 1368, 1373 (9th Cir.1993) (citations omitted), *as amended,* May 11, 1993.

There are several reasons why we reject Rogers' argument that the courts lack jurisdiction. First, the purpose of the extradition process is to obtain a court's personal jurisdiction over a defendant. 2 D. O'Connell, *International Law* 792–806 (1965) (Ch. 23, "Personal Jurisdiction: Extradition and Asylum"). The Supreme Court long ago recognized that the doctrine of specialty implicates the question of whether there is personal jurisdiction over a defendant as a result of the extradition process. *United States v. Rauscher,* 119 U.S. 407, 432–33, 7 S.Ct. 234, 247–48, 30 L.Ed. 425 (1886); *accord, United States v. Najohn,* 785 F.2d 1420, 1422 (9th Cir.) (per curiam), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986); *United States v. Vreeken,* 803 F.2d 1085, 1088–89 (10th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). In civil cases, Federal Rule of Civil Procedure 12(h)(1) mandates a waiver of the defense of lack of personal jurisdiction unless it is raised in the answer. *Elder v. Holloway,* 975 F.2d 1388, 1395 n. 4 (9th Cir.1991) (listing cases), *cert. granted,* —— U.S. ——, 113 S.Ct. 3033, 125 L.Ed.2d 721 (1993). Here, Rogers filed his answer on February 20, 1990, but he did not claim a defense based on a lack of personal jurisdiction. He did not move to dismiss based on the doctrine of specialty until March 22, 1991, well beyond the point at which he could assert a defense of lack of personal jurisdiction. *Cf. Vreeken,* 803 F.2d at 1088–89 (court refuses to reach rule of specialty claim for failure to timely raise defense of lack of personal jurisdiction in a criminal case).

Second, "the protection [of the rule of specialty] exists only to the extent that the surrendering country wishes." *See Najohn,* 785 F.2d at 1422. The Swiss Federal Office for Police Matters, the office in the Swiss government responsible for international extradition cases, has represented to the Office of International Affairs ("OIA") of the Department of Justice that the rule of specialty in Article IX of the Treaty for the Extradition of *Criminals* does not apply to this *civil* enforcement action filed by the SEC. Declaration of Mary Jo Grotenrath, Associate Director of the OIA, at 2, para. b. Therefore, as a matter of international comity a trial in this civil matter will not offend the Swiss. *Cf. United States v. Cuevas,* 847 F.2d 1417, 1426 (9th Cir.1988) ("[T]he United States has guaranteed, pursuant to [the Swiss] treaty, that it will honor limitations placed on prosecution in the United States."), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989)).

Finally, in support of his argument that federal courts lack jurisdiction where there is a rule of specialty, Rogers cites *Van Cauwenberghe v. Biard,* 486 U.S. 517, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988).[2] In that case, the Supreme Court stated:

> In the absence of an explicit agreement obligating the United States to protect the extradited person from the burdens of a civil suit, we believe that there is little potential that the extraditing state, in this case Switzerland, will view the mere conduct of a private civil trial as a breach of an obligation by the United States not to abuse the extradition process.

*Id.* at 525, 108 S.Ct. at 1951 (citation and footnote omitted). Here, there is no question of an abuse of the extradition process on the part of the United States where the Swiss have made known their belief that the Treaty does not apply to this action.

## II. *Whether the Eurobond Investment Program is an Investment Contract*

### *Standard of Review*

 A grant of summary judgment is reviewed de novo. *Darring v. Kincheloe,* 783

---

**2.** Rogers, who appears pro se, did not cite *Van Cauwenberghe* in his opening or reply briefs on appeal. Instead, he cited this case in a letter to the Clerk of the Court filed January 25, 1993. After this case was submitted on the briefs on February 1, 1993, we directed the SEC to solicit the views of the Departments of State and Justice on the application of *Van Cauwenberghe* to a civil action brought by the government and whether the rule of specialty precludes this action under the United States–Switzerland Extradition treaty. The Departments filed a joint amicus brief.

F.2d 874, 876 (9th Cir.1986). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986). We review de novo the district court's determination that the Eurobond program consisted of investment contracts. *SEC v. Goldfield Deep Mines Co.,* 758 F.2d 459, 463 (9th Cir.1985).

In its Findings of Fact and Conclusions of Law, the district court found that:

> The investment program offered and sold by Rogers and Eurobond Exchange Ltd., a/k/a EuroGold and Bond Exchange Ltd., a/k/a EBX Trust A.G. (Eurobond) was an investment contract and therefore, a security under Section 2(1) of the Securities Act of 1933 [15 U.S.C. 77b(1) ] (Securities Act) and Section 3(a)(10) of the Securities Exchange Act of 1934 [15 U.S.C. 78c(a)(10) ] [Exchange Act].

No. CV90–378 DT (GHKX), Final Judgment and Order of Permanent Injunction and Disgorgement Against Gerald Rogers, at 2, para. 2. The court found that Rogers had not registered the Eurobond investment contract, a security, but that he had made use of the means and instruments of transportation and communication in interstate commerce and of the mails in its offer and sale. The court therefore concluded that Rogers had violated sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c) (1988).[3]

**3.** Sections 5(a) and (c) of the Securities Act provide:

(a) Sale or delivery after sale of unregistered securities

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

■ The federal securities laws apply to securities in the form of investment contracts. Section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1), and section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), provide that "[t]he term 'security' means any ... investment contract...." The Supreme Court has held that, for purposes of the Securities Act, an investment contract "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

■ The SEC argues that the Eurobond program is an investment contract because, as *Howey* requires: (1) there was an investment of money; (2) the investment occurred in a common enterprise; and (3) the profits were to come solely from the efforts of others. *See Goldfield Deep Mines Co.,* 758 F.2d at 463 (listing elements) (citing *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104). We discuss the facts supporting the three elements of the *Howey* test.

### 1. Investment of Money

It is undisputed that there is an investment of money: "At least 26 Americans invested over $1.6 million in defendants' program." SEC Brief at 19. Thus, the first element is met.

### 2. A Common Enterprise

We have described a common enterprise:

> ....
>
> (c) Necessity of filing registration statement
>
> It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

A common enterprise is a venture "in which the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment....'" It is not necessary that the funds of investors are pooled; what must be shown is that the fortunes of the investors are linked with those of the promoters, thereby establishing the requisite element of vertical commonality. Thus, a common enterprise exists if a direct correlation has been established between success or failure of [the promoter's] efforts and success or failure of the investment.

*Id.* (quoting *Brodt v. Bache & Co.*, 595 F.2d 459, 460 (9th Cir.1978) (quoting *Securities and Exchange Comm'n v. Glenn W. Turner Enter.*, 474 F.2d 476, 482 n. 7 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973)) (other citations omitted).

To understand whether there is a common enterprise, it is necessary to describe the Eurobond program in detail. The program involved three primary steps. First, the investors sent their investment checks (which had to be $5000 or greater) with a client instruction form to Eurobond's California office, which then forwarded the checks to Eurobond's bank, Bank Rohner, in Switzerland, or the investors wired funds to a New York account of Bank Rohner, which then transferred the funds to Switzerland. With the funds, Rogers would select and purchase foreign treasury bonds with high interest rates issued by stable foreign governments, such as the United Kingdom, Australia, Spain, Sweden, Norway, and Denmark. Second, Rogers would obtain, from Eurobond or some bank of his choice, a low-interest loan to finance additional bond purchases on behalf of investors. The loans were in foreign currencies with interest rates 25–30% lower than the rate of return on the bonds. Both the interest rate and the currency exchange rate were set as decided by Eurobond. All bonds purchased were pledged as collateral for the loan and were required to be held by the bank or Eurobond. Third, Rogers and Eurobond then used all the loan proceeds to buy, on behalf of the investor, more foreign government-issued bonds. Rogers and Eurobond represented that because of "the credibility, safety, earnings and liquidity" of the government bonds, the loan they arranged would be four times the sum provided by the investor. The loans, therefore, financed eighty percent of the total bonds purchased, while the remaining twenty percent of the bonds were purchased with the investor's initial funds. The profit to the investor was derived from the difference between the interest rate received on the foreign treasury bond and the interest rate paid on the foreign-currency loans, less fees and costs.

Under Rogers' program, therefore, an investor providing $100,000 would earn a return on $500,000 worth of bonds. Eighty percent of the purchases were financed by or through Eurobond. Obviously, the key to this program was finding low-cost loans. The promotional materials assured the investor that Eurobond had the expertise, experience, and contacts to arrange such loans. Eurobond refused to disclose the identity of the banks providing the loans.

Rogers contends that this is no common enterprise because the investors did not share profits with Eurobond. He states that Eurobond's compensation was not paid from the investor's profits; rather, it was paid up front so that the investors did not share directly or indirectly in the profits of Eurobond. There is support for this contention in the record. Each investor sent Eurobond Exchange Ltd. a set of client instructions to the custodian, Bank Rohner of Switzerland. The instructions gave Bank Rohner the authority to withdraw up front from the gross funds transmitted a transaction fee of 3% to Eurobond Exchange. Further, the instructions required that a loan fee of 1% of the gross funds for each year of the duration of the investment be remitted up front to Eurobond Exchange Ltd. These instructions belie the SEC's claim that "Rogers admits that Eurobond's compensation was paid from investor's profits: '[A]ll interest income came from the [bond] issuing countries and all expenses ... [were] paid out of the interest income.'" SEC Brief at 22–23 & n. 22 (quoting Rogers' Opening Brief at 2, Attachment

"A."). The instructions also belie the SEC's claim that Eurobond was to "[m]ake a non-recourse loan ... and invest loan proceeds ... to earn income to pay costs." *Id.* at n. 22.[4]

Rogers states:

Eurobond's commission was paid upfront at the advice of Client by the custodian bank before the bonds were even purchased. The investors['] profit, on the other hand, was dependant [sic] on the Bond Issuers' continuance of interest payments. With this arrangement Eurobond[']s prepaid profit was not shared with the investor, nor did Eurobond share any los[s]es that could inure to the investor. In this manner, Eurobond could get rich from upfront commission, which the investor could lose, if the bond issuers defaulted.

Reply Brief at 4. Rogers continues:

Appellant offered only investment advice through licensed securities brokers coupled with a limited power of attorney to carry out the investor[']s desires that resulted in the purchase of Triple A rate bonds, sold and financed by very reputable banks. In return, the defendants were paid upfront fees and a termination fee, which none were shared with the investors. Furthermore, the record is void of evidence that the investors shared in the profits of Eurobond!

Reply Brief at 8.

However, there are other factors that point to a common enterprise. The client instructions contain another clause that states:

It is understood and agreed that any income over and above the determined "Net Annual Rate of Return"[5] whether interest, currency valuation or capital gains shall be the property of [Eurobond Exchange Ltd.] *in addition to the fees mentioned herein.* This income, if any, shall constitute payment and consideration for the [Eurobond Exchange Ltd.] Set Interest and Currency Exchange Rate Loan, in full.

(Emphasis added). According to this clause, the investor could receive no more than a predetermined rate of return. If the actual rate of return were higher because, for example, Rogers negotiated a lower than expected interest rate on the foreign currency loan, Eurobond received that portion of the profit. In short, Eurobond and the investor appear to have shared the profits from Eurobond's efforts in the program. This is a close question because Rogers segregated the investors' profits from the total profits by negotiating a set rate on interest and currency on the loans with the investors; that is why he argues there was no sharing.

Even if this factor does not make the program a common enterprise, however, the investor and Eurobond shared the risk of loss. If the foreign governments were to default on the bonds, Eurobond and the investors would lose whatever profits they gained from those bonds purchased with the foreign currency loans. As for those loans from Eurobond itself, the investors were advised that "if [Eurobond] defaults you could lose a pro rata portion of your investment." The investor's success, then, was correlated with the financial stability of Eurobond. We have held that where an investor's avoidance of loss depends on the promoter's "sound management and continued solvency," a common enterprise exists. *United States v. Carman,* 577 F.2d 556, 563 (9th Cir.1978). "This risk of *loss* is sufficient to bring the transaction within the meaning of a security, even where the anticipated financial gain is fixed." *Id.*

Thus there is a common enterprise. Although the initial purchase of foreign treasury bonds with the investor's funds resemble an ordinary broker arrangement with commission, it is the subsequent leveraged investment that requires a sharing of profits

---

4. "Costs" is used by the SEC to include Eurobond's fees, but that is not what the instructions specify.

5. Rogers explains that the "net annual rate of return" is:

the difference between two known factors at the time of the transaction. First, the interest to be received from the bond issuing countries, 'at market' and secondly, the total cost of the loan, (loan reserves, fees and interest), which is subtracted. The sum is then divided by the investors' cash amount, (good funds), to determine the annual percentage figure.

Opening Brief at B–4.

and losses. That investment supports the conclusion that there was a common enterprise.

### 3. Profits Solely From the Efforts of Others

Rogers contends he acted merely as an advisor and that profits were determined by "market forces." However, it is beyond dispute that any profits to investors came from the efforts and expertise of Eurobond, and that Eurobond's sales material stressed this fact:

> Most important, we are the company that has the banking affiliations that enable us to make "Set Interest and Exchange Rate Loans" to finance 80% of this Treasury Bond Investment. It is the loan that makes this strategy viable world wide for both small and large investors alike.

The SEC argues that Eurobond's efforts were essential to the success of both Eurobond and the investor because four ingredients were determined solely by Rogers: (1) when to purchase the government-issued treasury bonds, and in what denominations and yields; (2) from what funding bank to obtain the loan, as well as when to obtain it, and what currency and what interest rate to use; (3) what government-issued treasury bonds to purchase with the loans proceeds, as well as when to purchase them and in what denominations and yields; and (4) when to effect the various currency exchanges necessary for the above transactions. There is no evidence in the record to contradict these assertions.

We affirm the district court's finding of an investment contract between the investors and Eurobond.

*Other Issues*

The SEC states there are two more issues: (1) the materiality to the investors of Rogers' status as a felon and a fugitive; and (2) whether the SEC engaged in discriminatory selective enforcement. We can uphold Rogers' fraud conviction without reaching the materiality issue. Moreover, to the very limited extent that Rogers' brief makes these items an issue, there is simply no evidence in the record to refute the showing that it was material to an investor's decision to invest in Eurobond that Rogers was a convicted fraud felon, used an alias, had pending against him a criminal indictment for securities fraud, had been enjoined from further violations of the securities laws, and was a fugitive from justice. Further, there is no evidence that the Commission engaged in discriminatory selective enforcement in its investigation of and civil action against Rogers.

AFFIRMED.