**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**LIFE PARTNERS, INC. and Brian D. Pardo, Defendants.**

Civ. A. No. 94–1861.

United States District Court, District of Columbia.

Aug. 30, 1995.

Leo Orenstein, John Gannon, Washington, DC, for Plaintiff.

Ida Wurczinger Draim, Thomas Kirby, Wiley, Rein & Fielding, Washington, DC, Patrick Roach, Bell, Boyd & Lloyd, Washington, DC, for Defendant.

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

This matter comes before the Court on plaintiff Securities and Exchange Commission's (hereafter "the Commission" or "SEC") motion for a preliminary injunction and other provisional relief. The Commission's complaint alleges violations of the securities and broker/dealer registration requirements and the antifraud statutes. The Commission's motion was fully briefed and orally argued to the Honorable John H. Pratt, but was reassigned to the undersigned upon Judge Pratt's death. I have carefully considered the transcript of the oral argument, the briefs of counsel, and the record herein. I conclude, as a preliminary matter, that defendants sold unregistered securities and were not registered as brokers or dealers, and grant a preliminary injunction to the Commission. I also conclude that the Commission also makes a strong *prima facie* showing that defendants made untrue or misleading statements. Preliminary relief is therefore granted to the Commission on this issue as well.

### I. *Background*

At issue is an unusual investment medium that rests within the grey area of securities law. Defendants Life Partners, Inc. ("LPI") and its president, Brian Pardo, "facilitate" the sale of life insurance policies from AIDS victims to investors at a discount. The investors then recover the face value of the policy after the policy holder's death. Meanwhile, the terminally ill sellers secure much needed income in the final years of life when employment is unlikely and medical bills are often staggering. This process is known as "viatical settlements" after the ecclesiastical term "viaticum" (the communion given to a dying person).[1] The Court must decide whether defendants simply act as agents for the investors or whether defendants are repackaging policies as investment contracts and promissory notes in violation of securities laws.[2]

LPI is the largest viatical settlement organizer in the country, accounting for approximately one half of the total settlement volume in 1994. For acceptance into the standard LPI program, an insured[3] must meet the following criteria: (1) be diagnosed with "Full Blown AIDS"; (2) have a life expectancy of twenty-four months or less[4] as determined by LPI's "independent reviewing physician"; and (3) be certified as mentally competent. LPI also represents that a policy qualifies for purchase only if it is issued by an insurance company rated "A –" or higher by a national insurance rating service. In addition, the policy allegedly must be in good standing and be noncontestable, transferable or eligible for irrevocable transfer of beneficiary.

LPI and Pardo attend to all aspects of finding and evaluating the policies. Typically, the policies are assigned to LPI, not to investors. After the insured's death, the benefits are also paid directly to LPI which then pays the investors. Investors have no direct contractual rights against the insurance companies that issue the policies.

---

1. The viatical settlement industry emerged during the late 1980s as a result of the AIDS crisis and has grown rapidly, from $5 million in life insurance policies in 1989, to perhaps $200 million in 1995. While a number of firms are in the field, they do not all operate the same way. Some represent the sellers, while others buy the policies for their own accounts. Other organizations, such as LPI, claim to represent the viatical purchasers, i.e., investors. This case concerns this type of activity.

2. Viatical settlements stretch existing laws that protect the interests of buyers and sellers. To address this, several states have passed viatical settlement legislation that is often codified in the insurance sections of the state codes. *See e.g.* Cal.Ins.Code § 10113.1 *et seq.;* N.Y.Ins. Ch. 28, Art. 78, § 7801 *et seq.;* Vermont St.T. 8 Pt 3, Ch 103, Sub ch. 5A, § 3826; N.M.Stat.Ann. § 59A–20–34; KanStat.Ann. § 40–2, 141 *et seq.* A review of the existing statutes show that these laws are geared to protect the patient seeking to sell an insurance policy, and not the investor seeking to buy policies through an organization like LPI. The Commission is concerned with this gap in regulation.

3. The Model Viatical Settlement Acts refer to the insured as a "viator." *See e.g.* N.Y. Ins. § 7801. This opinion will refer to the terminally ill policy holder as the "seller", "insured", or "viator."

4. Policies of viators with longer life expectancies are accepted under a special program discussed *infra.*

Whether they receive a return on their investments or even recover their principal depends upon LPI's ability to honor its contractual obligations to them.[5] The Commission is also concerned that ninety percent of LPI is owned by offshore corporations whose owners the SEC has been unable to identify.

The Commission alleges that defendants are violating sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a) ], and sections 10(b), 15(a), and 15(c) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78o(a), 78o(c) ]. The SEC does not contend that all viatical settlements are securities, but limits its focus to three LPI offerings. The first is the standard policy of an insured with a life expectancy of twenty-four months or less. The second involves the standard policy structured as an Individual Retirement Account ("IRA") investment.[6] The third offering permits investors to select the policies of viators expected to live longer than two years. Because the return on this longer term investment is more speculative, LPI promises to facilitate the resale of these investments to other LPI investors. In the Commission's view, LPI is illegally creating a secondary market in these longer term policies. In addition, the Commission claims that LPI's solicitation and promotional materials contain materially false and misleading statements and omissions. Defendants vigorously deny these allegations.

## II. *Analysis*

■ The Commission is entitled to seek provisional relief on a "proper showing" of violative conduct. 15 U.S.C. §§ 77t(b), 78u(d)(1). Unlike a private litigant, the SEC is not required to show irreparable injury or a balance of equities in its favor. Instead, it must make out a "strong *prima facie* case of previous violations" and show that there is "a reasonable likelihood that the wrong will be repeated." *S.E.C. v. Int'l Loan Network*, 770 F.Supp. 678, 688 (D.D.C.1991).

## A. *Whether viatical settlements are exempt from securities laws.*

■ The initial question before the Court is whether a viatical settlement is an insurance policy exempt from securities laws. § 3(a)(8) of the Securities Act, 15 U.S.C. § 77c(a)(8). This exemption is based on the long tradition of vesting regulation of the "business of insurance" in the states. *See* McCarran–Ferguson Act, 15 U.S.C. § 1012(b). It is not dispositive what form the assets underlying the investment are in as substance and not form is the guide. *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 123–24, 88 L.Ed. 88 (1943). The hallmark of "insurance" is the spreading and underwriting of a policyholder's risk. *SEC v. Variable Annuity Life Insurance Co.*, ("*VALIC*"), 359 U.S. 65, 73, 79 S.Ct. 618, 623, 3 L.Ed.2d 640 (1959). By contrast, in a securities "investment" the basic risk is borne by the purchaser of the investment not by the issuer. *Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 566–68 (7th Cir.1991), *cert. denied*, 502 U.S. 1099, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1993). Securities, unlike insurance policies, do not transfer or spread risk.

■ The Court has no difficulty concluding that viatical settlements do not qualify under the section 3(a) exemption. Viatical settlements do not transfer or distribute risk. The investor (buyer) does not assume any risk from the seller. The buyer does undertake an investment risk that the seller will live longer than expected, thereby reducing the buyer's return on investment. Such a

---

**5.** Regardless of whether defendants see themselves as owners of the policies or merely as agents, the insurance companies have every reason to assume defendants own the policies. "Before the death of the insured, the Owner of this policy alone shall be entitled to all rights granted by this policy." Plaintiff's Ex. 49 (assignment to transfer policy ownership). Defendant Pardo is listed as the beneficiary of the policy and is given authority to assign his tax rights or change the beneficiary at any time.

**6.** Tax laws prevent funds from an IRA being used to purchase an insurance policy. Under LPI's scheme, the investor instructs the IRA custodian to purchase a non-recourse note from a trust of which LPI is the trustee. The note is collateralized by a life insurance policy which is held by the trust. After the insured dies, the trust forwards the proceeds to the investor's IRA in exchange for the retirement of the note.

risk, however, is inherent in any investment and does not serve the central purpose of insurance: to transfer risk from the insured to the insurer. This has already been done by the insurance company which issued the policy. It is equally clear that LPI and Pardo are not in the "business of insurance" so as to be covered by the McCarran–Ferguson Act. "The relationship between the insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance'." *SEC v. National Securities, Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969). LPI does not issue insurance policies or underwrite risk or undertake the normal activities of an insurance company.

Defendants are also concerned about the effects of securities disclosure rules on the privacy of viators by requiring terminally ill sellers to comply with the securities disclosure requirements. This is a false concern. The disclosure obligations fall only on those selling or offering securities, not on those selling assets which are then repackaged by others as securities. The Commission readily agrees that a straight viatical settlement is not a security.[7] It is the methods employed by defendants which are challenged.

**B. *LPI's standard viatical settlement as a security.***

▮ The Court must decide whether the products offered by defendants qualify as investment contracts under section 2(1) of the Securities Act. An investment contract is a

> contract, transaction or scheme whereby a person invests his money [1] in a common enterprise and [2] is led to expect profits [3] solely from the efforts of the promoter or a third party.

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–1103, 90 L.Ed. 1244 (1946). Under recent refinements, the re-

quirement that the profits be secured "solely" from the efforts of others has been diluted to include profits secured "predominantly" from the efforts of others. *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C.Cir. 1992); *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The substance of an investment contract is a security-like interest in a "common enterprise" that is expected to generate profits through the efforts of others. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Rodriguez v. Banco Central Corp.*, 990 F.2d 7, 10 (1st Cir.1993). The parties to the instant case do not contest that the buyers of viatical settlements are investing money. Therefore, the Court will concentrate on the three prongs of the *Howey* test.

**1. *Common Enterprise.***

▮ Courts have identified three types of commonality in a quest to bring meaning and uniformity to this prong of the *Howey* test. The first is "horizontal commonality" which demands that the fortunes of two or more investors be joined in a pooling of interests. *Wals v. Fox Hills Development Corp.*, 24 F.3d 1016, 1018 (7th Cir.1994). The fortunes of investors are tied by pooling of assets, usually combined with a pro-rata distribution of profits. *Id.; Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir.1994). The second type of commonality is "broad vertical" which considers whether the fortunes of investors are tied to the efforts of the promoter. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir.1974). The final type of commonality is "strict vertical" which centers on whether fortunes of investors are tied to the fortunes of the promoter. *Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir.1978). The Court need not decide which measure of commonality is appropriate because each type is present in the instant case.[8]

---

**7.** Defendants argue that even if viators are not the issuer of a security, they might have to expend precious resources fighting discovery requests since their life expectancy determines the "offering price" of the viatical settlement. Viators, however, could face similar expenses fighting dubious discovery requests even now if, for

example, a present investor sued LPI under a breach of fiduciary duty theory.

**8.** Although the D.C.Circuit has not indicated which test to apply, a judge of this Court previously held that broad vertical commonality does

Horizontal commonality exists through LPI's sale of fractional interests in the death benefit due under a single policy. The fortunes of each investor are tied to that of the other investors in that policy, with proceeds to be divided on a *pro rata* basis as contemplated in *Revak* and *Wals*. The scenario facing us is similar to that recently considered by the Sixth Circuit in *Resolution Trust Corp. v. Stone*, 998 F.2d 1534 (10th Cir.1993). In that case, the promoter (called the "venture agent") created several joint ventures with each venture to sell leases in a particular musical master recording. Three or more investors were included in each venture. *Stone v. Kirk*, 8 F.3d 1079, 1082, 1085. (6th Cir.1993). The success of each joint venture was independent of the other ventures, but its success or failure would affect each investor in that venture. The Court of Appeals concluded that horizontal commonality existed because the money pooled from each joint venture was used in each instance for the benefit of all members of that venture. *Id.* at 1085.

A similar situation is before the Court. Defendants line up several investors for each settlement. The funds from all investors in a viatical settlement are pooled together, but segregated from the funds of investors in other settlements. Similarly, the returns on each settlement are divided solely among the investors in that settlement. Contrary to defendants' assertions, it is not dispositive that the success of one settlement has no effect on other viatical settlements. It is sufficient that the fortunes of the investors in each viatical settlement rise and fall together.

Both types of vertical commonality are also present in this case. The investors' fortunes are tied to those of the promoter since LPI takes title to the policies. From the perspective of both the insurance company and the insured, LPI is the new owner and beneficiary of the life insurance policies. Investors are dependent upon LPI to protect their interests, and their interests would be greatly affected by LPI's dissolution or insolvency.

Such risks are sufficient to meet the test for vertical commonality. *S.E.C. v. Eurobond Exch. Ltd.*, 13 F.3d 1334, 1340 (9th Cir.1994). LPI investments constitute a "common enterprise" under *Howey*.

## 2. *Expectation of Profits.*

■ The Supreme Court has defined "expected profits" for purposes of securities law as an investor's anticipation of profits either through capital appreciation resulting from development of the initial investment, or participation in earnings resulting from use of investors' funds. *United Housing Foundation v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). The economic reality of the transaction must be scrutinized. T. Hazen, *Law of Securities Regulation* 17. An instrument is likely to meet this prong of the *Howey* test when the purchaser's motivation is to receive a return on the investment rather than to use or consume the item. *Forman*, 421 U.S. at 858, 95 S.Ct. at 2063; *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 562, 99 S.Ct. 790, 797–98, 58 L.Ed.2d 808 (1979) (pension fund not security in part because profit from fund incidental motivation for taking job).

The undisputed evidence in this case indicates that investors in viatical settlements are concerned with gaining a return on their investment. "[R]ates of return on viatical settlements consistently out perform market rates by a wide margin." Plaintiff's Ex. 17 ("Life Partners Newsgram"). Indeed, the material strongly emphasizes the superior return to be expected. "The discount for the longer term commitments is higher and, therefore, the potential annual yield more attractive." Plaintiff's Ex. 39 ("Life Partners Newsgram", dated January, 1994).

Defendants argue that there is no capital appreciation in this case because the investor knows in advance the amount he will receive when the policy matures. They cite to several cases holding that fixed interest rates or interest rates tied to a market rate do not yield *Howey* profits. *See e.g. Stone*, 998 F.2d at 1540; *First State Bank v. American Nat.*

not satisfy the first prong of *Howey*. *Meredith v. Conticommodity Services, Inc.*, Fed.Sec.L.Rep. ¶ 97,701 at 98,671 (D.D.C.1980) (Gasch, J.)

(broad vertical commonality renders common enterprise element a mere redundancy); *accord Revak*, 18 F.3d at 88.

*Bank*, 690 F.Supp. 967, 970 (D.Wy.1988) (*Howey* "profits" do not include situations where the return on investment is fixed or contractually agreed to). The instant case is different. Although the face value of the insurance policy is fixed, the return on investment varies based on the ability, or inability, of the terminally ill to outlast LPI's life expectancy estimates. The return is also based on LPI's ability to translate that estimate into a valuation of the policy. What results is the prospect of a fluctuating return tied to the performance of an entity rather than a fixed or market based return. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 284 (5th Cir.1992); *Stone*, 998 F.2d at 1540. Investors' return qualifies as profit under *Howey*.

### 3. *Derived from the efforts of others.*

■ It is clear from LPI's promotional materials that it offers diligence and expertise in discovering and evaluating the legal status of an insurance policy and the insured's medical condition before offering it for investment. After the investment is made, LPI offers continued services of a more ministerial nature: it periodically checks on whether the insured is alive; submits claims for death benefits to the insurance companies; accepts this payment; and computes and distributes *pro -rata* shares of benefits to investors. At issue is whether the Court can consider all LPI's efforts or only those occurring after the investment. Although courts have not had much occasion to address this point, the Court concludes that existing caselaw supports but one conclusion.

As a general rule, the Court considers only managerial or entrepreneurial efforts which take place concurrently with or after the sale of the security. 5B Arnold S. Jacobs *Litigation Under Rule 10b-5* § 38.03[b][v] esp. n. 87–88 (citing *Emisco Industries, Inc. v. Pro's Inc.*, 543 F.2d 38, 41 (7th Cir.1976) (invest-

ment present only if reliance is on present or future efforts of another to produce profit)). The Court remains free to consider the promoter's efforts immediately surrounding the sale when such efforts are based on the promoter's expertise. Jacobs, § 38.03[b][ii] and [b][v] esp. n. 87. With respect to such efforts, the District Court for the Southern District of New York concluded that investment contracts were found

> [in] cases where tangible or intangible property was purchased by the investor in the expectation that it would appreciate in value, either [from] the promoter's expertise in selecting the property or [from] the promoter's managerial or entrepreneurial efforts subsequent to the purchase of the property.

*S.E.C. v. Energy Group of America, Inc.*, 459 F.Supp. 1234, 1241 (S.D.N.Y.1978); *Gary Plastic Packaging v. Merrill Lynch*, 756 F.2d 230, 234–35, 240 (2d Cir.1985) (court considered defendant's expertise in selecting certificates of deposit and investigating the issuers). The Court may consider the LPI's particular expertise in selecting and evaluating the policies prior to sale; expertise which the investor is dependent upon. *C.f. Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1035 (2d Cir.1974) (investment contract when whiskey investment scheme promised promoter's expertise in selecting whiskey); *Eurobond*, 13 F.3d at 1341 (efforts of promoter essential when he determined when, in what denominations, and from where to purchase investments). While the date of the insured's death is beyond defendants' control, the investor's return is very much dependent on defendants' evaluation of when that event is likely to occur.[9] It would be improper in this era of increasingly complex investment tools for the Court not to consider the particular efforts of the promoter simply because the efforts occurred in the immediate context of the sale and not later.[10]

---

9. In addition, LPI must value each policy based on individual considerations and in the absence of market prices. This situation is readily distinguishable from those involving simple commodities contracts which promise interchangeable products that can be procured from any number of sources. *Id.; Noa v. Key Futures, Inc.*, 638

F.2d 77, 80 (9th Cir.1980) (national market for silver that was not dependent upon promoter).

10. The Court's conclusion is bolstered by LPI's own promotional material which reads: "DO I NEED TO DO ANYTHING FURTHER? No, but Life Partners does". Plaintiff's Ex. 5, p. 3–4 (listing LPI's continuing services). This evi-

Defendants argue that the efforts of the promoter must continue after the investment for the instrument to qualify as an investment contract. This standard is satisfied here assuming *arguendo* that continued efforts after the investment are required. While the Court agrees with defendants that these post-investment activities are often ministerial in nature, two factors tip the balance in the SEC's favor. The first is the pre-investment work by LPI which is undeniably essential to the overall success of the investment. The efforts surrounding an investment should be considered in their entirety.[11] More importantly, defendants' post-investment efforts are critical since LPI, not the investor, has the contractual relationship with the insurance company. The investors are dependent on LPI because they lack any contractual rights *vis-a-vis* the insurance company and are strangers to both the insurance company and the other investors who bought interests in the same policy. As things now stand, LPI and Pardo could designate themselves or their nominees as beneficiaries, and there is the danger that defendants' creditors might attempt to reach the policies. *See Jenson v. Continental Financial Corp.*, 404 F.Supp. 792, 805 (D.Minn. 1975) (court concerned by limited investor control when funds invested in account in broker's name alone).

Finally, defendants argue that investors in viatical settlements have such an active and controlling role that the expectation of profit is not derived solely—or even primarily—from the efforts of others. The Court disagrees. While investors may be asked for input such as "the amount they would like to spend, ... T-cell counts, insured's age, insurance company rating, life expectancy and the like",[12] they are in fact limited to LPI's eval-

uation of the patient. Moreover, this investor input is of little practical significance as LPI claims to accept only policies in insurance companies rated "A−" or better where the insured has a life expectancy, as determined by LPI, of less than two years. The mere retention of theoretical rights of control are of no consequence where the investor's role is essentially a passive one. *SEC v. Aqua–Sonic Products Corp.*, 687 F.2d 577 (2d Cir.1982). The Court concludes that investors who purchase viatical settlements through LPI anticipate their profits to be derived principally from the efforts of others.

### 4. *Conclusion.*

The Court concludes that LPI's basic policy is an investment contract that is subject to federal securities law.[13] This holding applies with additional force to defendants' new plan offering policies where the insured does not yet have full blown AIDS and is expected to live longer than two years. Investors in such policies are told that in addition to holding the policy to maturity, they will have certain investment options including reselling the policy back through LPI to other investors after one year for a 15% rate of return or reselling the policy back through LPI to other investors after two years for a promised 30% annual return. Plaintiff's Ex. 39. The possibility of resale depends on LPI's continued existence and its ability to organize a secondary market and find buyers. *Gary Plastic*, 756 F.2d at 240 (investor must rely on promoter's promise to maintain marketing efforts and create secondary market).

### C. *LPI's purported misrepresentations.*

■ Among the Commission's allegations of material misrepresentations, some of which are of minor or questionable relevance,

---

dences the continuing nature of the LPI/investor relationship through a package of services. *Teague v. Bakker,* 35 F.3d 978, 988–89 (4th Cir. 1994) (focus is on marketing approach adopted by seller); *SEC v. Brigadoon Scotch Dist. Ltd.,* 388 F.Supp. 1288, 1292 (S.D.N.Y.1975) (courts consider investment-oriented advertising in finding the presence of an investment contract).

**11.** It is not dispositive that some of the activities are carried out by an escrow agent acting on LPI's instructions. Nothing in *Howey* requires

the efforts of others to be exclusively those of the issuer or promoter.

**12.** Plaintiff's Ex. 1 (Pardo Affidavit), ¶ 8.

**13.** Based on this holding, the Court need not consider in detail whether the promissory note issued to avoid IRA related tax problems constitutes a security *per se* under the "family resemblance test." *See Reves v. Ernst & Young,* 494 U.S. 56, 65, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990).

are the following: (1) defendants' failure to inform investors that the SEC previously accused Pardo of engaging in securities fraud—an accusation which led to the voluntary issuance of an injunction; (2) a similar failure to inform investors that Pardo is subject to a $900,000 judgment obtained by the Resolution Trust Corporation; (3) LPI's acceptance, contrary to statements in its promotional material, of policies that are not transferable or prohibit assignment for consideration;[14] (4) defendants' failure to disclose that state viatical settlement laws may apply and often give the insured an absolute right to rescind within a specified time; and (5) defendants' failure to disclose that the "independent reviewing physician" is in fact a director of LPI. These allegations are less than overwhelming. However, it is for the trier of fact to determine whether the above allegations amount to omissions and misrepresentations, and if so, whether a reasonable investor would consider them important. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Their disposition will await further action on the merits. The Commission has made out a strong *prima facie* case for preliminary relief, particularly with regard to defendant Pardo's prior legal problems and outstanding judgments. The importance of these omissions are magnified by LPI's at least theoretical ownership of the policies.

### D. Remedy for violations.

The Court is not free to ignore violations of federal securities law or grant exceptions from these laws in worthy cases. This case is unusual, although not unique, in that there have been no allegations that any investor, terminally ill patient, or insurance company has been defrauded, misled, or is in any way dissatisfied with an LPI viatical settlement. This is despite an apparently exhaustive two year investigation by the Commission. While this does not diminish

the need to restrain continued unlawful conduct, the Court is entitled to consider the apparent lack of injury in fashioning an equitable remedy. *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1106 (2d Cir.1972) (disadvantages and possible deleterious effect of remedy must be balanced against need for relief). The SEC must "make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks." *SEC v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir. 1990). The Court must consider the effects of the Commission's request for relief on a business that helps so many terminally ill patients. It is "the standards of the public interest, not the requirements of private litigation, [that] measure the propriety and need for injunctive relief." *Id.* at 1035–36 (quoting *Hecht Co. v. Bowles,* 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944)).

The Court must consider the valuable funds provided AIDS patients in their final illness. The availability of such funds provides through the private sector what the already depleted public sector would otherwise have to supply. The Court cannot ignore these beneficial results, results which caused the National Association of People with AIDS to side with defendants. That organization is motivated by a fear that a major disruption in LPI's business will adversely affect terminally ill patients who cannot wait while the viatical settlement market is reconstituted.[15]

The Court concludes that the Commission is entitled to more limited preliminary relief than it seeks. Although the Court finds that defendants are selling unregistered securities, the Court noted at the outset that this case rested in the grey area of securities law. Defendants have also indicated a willingness to comply with any decision of the Court. Defendants' reply brief, p. 22. The Court cannot, of course, take this promise at face

---

14. In such cases, Pardo is listed as transferee to create the false impression that the transfer is a gift. Plaintiff's Ex. 19 (Pardo testimony at 171, 292). It is not clear to what extent investors would suffer if an insurance company discovered this rouse.

15. The SEC argues that other companies undertake viatical settlements. While that may be true, the undisputed evidence indicates that the two organizations the Commission cites by name are no longer accepting policies. The Court has no doubt that other companies would spring to fill any void left by LPI over time, however, that is of little consolation to those presently in need.

value. Defendants must prove this by forthwith complying with securities law. Defendants shall also execute all documents necessary to effect transfer of ownership of all polices that underlie the investments offered and sold by the defendants to a neutral and independent agent agreeable to both defendants and the Commission. In thirty days the Commission shall file a report with the Court on defendants' efforts to bring themselves into compliance with securities law and the Court's preliminary injunction. At that time the Commission may also move the Court for any further relief, including summary judgment, a permanent injunction, appointment of a receiver, an accounting of assets, and disgorgement of profits. In addition, the Court will preliminarily enjoin defendants from violating sections 15(c) of the Exchange Act [15 U.S.C. § 78o(c) ] and Rule 15c1-2 thereunder [17 C.F.R. § 240.15c1-2]. Defendants shall refrain from engaging in any act or making any statement which is made with knowledge or reasonable grounds to believe is untrue or misleading.

### III. *Conclusion*

For the foregoing reasons, the Court grants a preliminary injunction to the Commission on the allegations that defendants sold unregistered securities, and on the allegations that defendants made material misstatements and omissions.

A separate order shall issue this date.

### *ORDER*

For the reasons set forth in the accompanying memorandum opinion, it is hereby

ORDERED that defendants' motion to dismiss is denied; and it is

ORDERED that plaintiff's motion for a preliminary injunction is granted on the issue of defendants' sale of unregistered securities in violation of sections 5 [15 U.S.C. §§ 77e(a) and (c) ], and 17(a) [15 U.S.C. § 77q(a) ] of the Securities Act of 1933 ("Securities Act") and violations of the broker registration requirements of section 15(a) [15 U.S.C. § 78o(a) ] of the Securities Exchange Act of 1934 ("Exchange Act"); and it is

ORDERED that defendants shall forthwith bring their operations into compliance with the applicable securities laws; and it is

ORDERED that as soon as practicable and in no event later than ten (10) days of this order, defendants shall execute all documents necessary to effect transfer of ownership of all policies to a neutral third-party mutually agreeable to defendants and the Securities and Exchange Commission. Said third-party shall hold all insurance policies transferred to him for the benefit of those investors who have purchased interests in them; and it is

ORDERED that until such time as the transfer is effected, defendants shall not dispose of such policies in any other way or designate a new beneficiary under any of such policies; and it is

ORDERED that in thirty (30) days the Commission shall file a report with the Court detailing defendants' compliance with securities law and this order; and it is

ORDERED that defendants LPI and Pardo and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, shall be preliminarily enjoined from, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a.) employing any device, scheme, or artifice to defraud;

(b.) making any untrue statement of a material fact, or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c.) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security, in violation of section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and

Rule 10b–5 thereunder (17 C.F.R. § 240.10b–5).

So Ordered.