**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**LIFE PARTNERS, INC. and Brian D. Pardo, Defendant.**

**Civil A. No. 94–1861 (RCL).**

United States District Court, District of Columbia.

Jan. 22, 1996.

Leo F. Dienstein, John Gannon, Securities and Exchange Commission, Washington, DC, for plaintiff.

Ida Wurczinger Draim, Thomas W. Kirby, Washington, DC, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

█ This matter is before the court on the plaintiff's motion to hold the defendants in contempt and to compel discovery. Plaintiff, the Securities and Exchange Commission ("SEC"), alleges that the defendants, Life Partners, Inc. ("LPI") and Brian D. Pardo, continue to engage in the practice of selling unregistered securities in violation of the registration and antifraud provisions of the federal securities laws. By continuing to sell the unregistered securities, the SEC alleges, the defendants have violated this court's August 30, 1995,[1] order and its September 18, 1995, order that required the defendants to, *inter alia*, bring their operations into compliance with the applicable federal securities laws. In response to the allegations, the defendants claim to have brought their operations into compliance, or, in the alternative, that they have made a good faith effort to do so. Upon consideration of the parties' most recent submissions, the court shall deny the SEC's motion to hold defendants in contempt. Although the court does not find the defendants' behavior to be contemptible at this time, the court does find that defendants have not brought their operations into compliance with the applicable securities laws. Accordingly, the court shall enjoin the defendants, pending a final judgment on the merits, from offering and selling unregistered securities in the form of investment contracts representing fractional interests in the death benefits under insurance policies written on the lives of persons with terminal illnesses.

---

1. *S.E.C. v. Life Partners, Inc.*, 898 F.Supp. 14 (D.D.C.1995).

## I.

## BACKGROUND

### A. *Procedural History.*

As fully discussed in this court's August 30, 1995, opinion, defendant LPI and its president, defendant Brian D. Pardo, facilitate the sale of life insurance policies from AIDS victims to investors at a discount. These so-called "viatical settlements" provide AIDS victims with much needed income in the final years of their lives while allowing investors to collect the face amount of the policy at the insured's death. As the facilitator, LPI takes an active role in finding and evaluating policies, determining the life expectancy of the insured, as well as locating investors. Prior to this court's August opinion, the insured assigned the policy to LPI, not to individual investors. At the insured's death, the benefits were paid to LPI who then dispersed the funds to investors. Under this scheme, investors had no direct contractual rights against the insurance companies that issued the policies.

The SEC contends that LPI's sale of fractional interests in an insurance contract amounts to a sale of an investment contract subject to the federal securities laws. Following an extensive investigation of LPI, the SEC brought this action seeking a preliminary injunction that would prohibit LPI from selling any further viatical settlements until it properly registered under the securities laws. The SEC also claimed that LPI's solicitation and promotional materials contain materially false and misleading statements and omissions.

In its August 30, 1995, opinion, this court concluded that LPI's basic policy is an investment contract that is subject to federal securities laws. Accordingly, the court entered a preliminary injunction that ordered LPI to "forthwith" bring their operations into compliance with the applicable securities laws. Further, the court ordered LPI to transfer the ownership of all the life insurance policies to a neutral third party, rather than retaining the assignments of the policies. Significantly, after considering the valuable service provided to AIDS victims by LPI, the court decided against enjoining LPI from selling the investment contracts pending their compliance with securities laws. Instead, the court ordered that the SEC file a report within thirty days detailing LPI's compliance with the securities laws and the court's order. Inherent in this order was the court's understanding that the SEC and LPI would work together to both preserve the valuable service provided by LPI as well as provide the protection for investors that the SEC desired.

Dissatisfied with the defendants' progress toward complying with the court's August order, the SEC moved for supplemental preliminary relief eight days following the entry of that order. In the meantime, defendants filed their notice of appeal and asked this court for a partial stay of these proceedings pending that appeal. On September 18, 1995, the court signed the parties' stipulation that resolved the issue of transferring ownership of the policies from LPI. In that stipulation, LPI agreed to transfer ownership of the policies to the investors themselves, rather than a third party.

With respect to defendants' motion for a partial stay pending appeal, on September 29, 1995, the court issued an order denying this request. The court also amended its August order in so far as it required the SEC to file a report on the defendants' compliance efforts. The court instructed the defendants to file a compliance report with the court within twenty days. After the SEC would have a chance to respond, the court would then decide if the SEC was entitled to further injunctive relief.

### B. *Compliance Efforts.*

Pursuant to the court's September 29 order, LPI filed its report of compliance with the court on October 19, 1995. In this report, Pardo and LPI described the changes that had already been made in its operations as well as the changes LPI was in the process of making. At the outset, the report indicated that the lack of cooperation on the part of the SEC hindered LPI's efforts to

develop a compliance strategy.[2] LPI's compliance strategy was twofold: (1) divest themselves of ownership of the policies purchased by investors, and (2) take steps to ensure that investors understand LPI's self-proclaimed "limited role," and that investors understand that they are in a position to exercise control over the policy.

To this end, LPI no longer takes record ownership of the policies, instead placing the policies in the names of the various investors. However, at the time of filing their compliance report, LPI had not yet completed the process of divesting itself of record ownership of policies sold prior to this court's August 30 opinion. With respect to ensuring that investors are aware of the control that they can exercise over the policies, LPI drafted a disclosure statement that it would provide to all new investors regarding the investor's rights. In that draft, LPI describes the post-sale services that it makes available to investors, for example, monitoring the insured and submitting claims for benefits, as only "a convenience and accommodation to the purchasers." In other words, investors can, if they so choose, exercise more control and have access to more information.

In response to LPI's report of compliance efforts, the SEC filed this current motion to hold the defendants in contempt. The SEC requests that the court enjoin LPI from selling any further settlements until LPI registers the settlements and sells them as securities. The SEC further asks that the court impose a fine for each day that LPI continues to violate the court's orders. Finally, the SEC moves to compel LPI and Pardo to produce discovery.

## II.

## ANALYSIS

A. *LPI's Compliance With Securities Laws.*

The threshold issue for the court is whether the defendants, through the changes in their operations detailed to the court, have brought their operations into compliance with federal securities laws.

1. *Definition of a Security Under Howey.*

Defendants first argue that because of changes made in their operations since the court's orders, their viatical settlements no longer meet the definition of a security under *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) [hereinafter *Howey* ]. The Supreme Court in *Howey* defined an investment contract under section 2(1) of the Securities Act as a

> contract, transaction or scheme whereby a person invests his money [1] in a common enterprise and [2] is led to expect profits [3] solely from the efforts of the promoter or a third party.

*Howey,* 328 U.S. at 298–99, 66 S.Ct. at 1102–03. In its prior opinion, this court concluded that defendants' operations satisfied all three elements of the definition of a security. LPI argues that the subsequent changes made in its operations negate both the commonality element as well as the efforts of a third party element. The court does not agree.

a. *Commonality.*

As fully discussed in the court's prior opinion, courts have identified three different tests for determining whether an investment meets the commonality element of the definition of an investment contract. However, the D.C. Circuit has not indicated which test to apply in this jurisdiction. Yet, because the court finds commonality under all three tests, this court need not speculate as to which test this circuit will adopt.

The first approach toward commonality is called "horizontal" commonality. Horizontal commonality demands that the fortunes of two or more investors be joined in a pooling of interests, and it typically requires a pro-rata distribution of profits. *See Wals v. Fox Hills Dev. Corp.,* 24 F.3d 1016, 1018 (7th Cir.1994). Horizontal commonality continues to be present under LPI's revised

**2.** The SEC claims that it will not provide advice to LPI on how to structure their transactions so as to fall outside the purview of the securities laws. In the opinion of the SEC, they are not in

the business of helping companies subvert the protections provided to investors by the securities laws.

investment scheme. Defendants argue that they have reduced their role to that of a procurement agent that creates the mere joint ownership of an asset among investors. In other words, although defendants continue to line up several investors to pool their funds in order to purchase a policy, because the investors are now made record owners of their respective share in the policy, defendants argue that there can be no common venture or enterprise.

The court disagrees. Vesting ownership in the names of the individual investors rather than LPI does little to change the nature of the transaction. For each policy, LPI locates several investors who pool their funds in order to purchase the policy. An individual investor cannot purchase a portion of an insurance policy alone; each investor depends upon the others to provide the remaining funds to purchase the entire policy. These investors then receive a pro-rata share of the proceeds upon the insured's death. That an investor is listed as a record owner of a portion of the policy does not alter either an investor's reliance on fellow investors to enable the initial purchase or the fact that the fortunes of each investor are tied to that of the other investors in that policy. Accordingly, horizontal commonality is present.[3] See Wals, 24 F.3d at 1018.

The remaining two tests for commonality are also satisfied by LPI's revised procedures. The "broad vertical" test for commonality considers whether the fortunes of investors are tied to the efforts of the promoter. SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 479 (5th Cir.1974). The "strict vertical" test focuses on whether the fortunes of investors are tied to the fortunes of the promoter. Brodt v. Bache & Co., 595 F.2d 459, 461 (9th Cir.1978). In its prior opinion, the court curtly found both types of vertical

commonality because LPI took record ownership of the insurance policy. In light of the court's reliance on this fact, defendants now argue that because the investors are now the record owners, vertical commonality is not present. Furthermore, defendants contend that because their proposed disclosure statement[4] informs investors that they may perform the post-closing services themselves, rather than relying on LPI to perform the services, investors' fortunes are no longer tied to either the efforts or the fortunes of LPI.

Although the prior opinion of this court did not need to address the other aspects of LPI's investments that link the fortunes and efforts of LPI with investors, as a result of the change in the ownership of the policies, the court now examines these other aspects and concludes that they are sufficient to satisfy both tests for vertical commonality. LPI continues to offer an extensive evaluation of the insured's medical condition and the quality and legal status of the insurance policy. LPI negotiates the purchase price with the insured. LPI also continues to monitor the insured, determine when the insured dies, document the death, submit the claim to the insurance company, and distribute the benefits among the investors. That LPI sends investors a form stating that an investor may, if they so choose, inspect documents or perform the post-closing services themselves does little to support LPI's claim that they have defeated vertical commonality. The court finds that the "control" supposedly vested by LPI in its investors is largely theoretical, and it does little to change the nature of the investors' role in the transaction. See generally, SEC v. Aqua–Sonic Prods. Corp., 687 F.2d 577 (2d Cir.1982). The investors under LPI's scheme are essen-

---

3. Defendants also seem to argue that because an investor may sell that investor's interest in a policy to a third party, horizontal commonality is not present. Because an investor may choose to either hold the policy until it matures or sell it to a third party, defendants argue that the fortunes of the investors are not tied together. This argument fails. The allegation that because investors can sell their interests in an investment (in a secondary market promoted by LPI) the investors' fortunes do not rise and fall together would mean that only investments that do not permit the resale of an individual's interest would be considered an investment contract under the securities laws. This makes little sense as it would allow any promoter to avoid the securities laws by providing investors with a secondary market.

4. Defendants have prepared a draft disclosure statement that they will be providing to potential investors. Defendants submitted this draft to the court in their compliance report.

tially passive; simply explaining to the investors that they may themselves perform some services already provided to them by LPI does not instill the control and access to information necessary to negate vertical commonality. To be sure, replacing LPI with the investors as the record owners of the policies eliminates part of an investor's reliance on the continued viability of LPI in order to protect their investment. However, when viewed as a whole, LPI's changes have done little to distance themselves from the investors. As a result, both forms of vertical commonality remain present.

#### b. *Expectation of Profits.*

Defendants do not allege and the court does not find that the changes made by defendants has any impact on the investors' anticipation of profits.

#### c. *Derived From the Efforts of Others.*

The only change relevant to whether or not investors' profits are derived predominantly[5] from the efforts of LPI is LPI's written statement to new investors that each investor may, if they so choose, perform the post-closing activities themselves. First, in concluding that this element of the *Howey* test was satisfied in its August opinion, the court focused not only on LPI's post-closing activities, but also on the extensive activities performed by LPI prior to sale and the resulting reliance placed on LPI by investors. *See Life Partners, Inc.*, 898 F.Supp. at 22. None of LPI's modifications affect this aspect of the court's analysis.

Second, the court finds that the control allegedly vested in investors by LPI's disclosure statement is merely theoretical and thus insufficient to negate this element.[6] As with the analysis under the vertical commonality inquiry, the court previously relied on the fact that LPI, not the investor, had the contractual relationship with the insurance company. However, the loss of this aspect does not command the opposite result. The supposed control given to investors is merely an option; LPI continues to perform the same post-closing functions as it has in the past unless the investors make the effort to do it themselves. All elements discussed above under the vertical commonality rubric apply with equal force here. Facial changes and an opportunity for the exercise of control by investors cannot provide the basis for concluding that investors no longer depend upon LPI for their profits. Finally, the court reiterates the importance of "the pre-investment work by LPI which is undeniably essential to the overall success of the investment." *Life Partners, Inc.*, 898 F.Supp. at 22.[7]

Therefore, upon further examination, the court finds that although LPI has made changes in its operation, the changes are not sufficient to bring their settlements out from under the definition of a security.

#### 2. *Private Offerings Exemption From Registration.*

 Defendants alternatively argue that in the event that their viatical settlements

5. The requirement of the *Howey* test that the profits be secured "solely" from the efforts of others has been relaxed to include profits secured "predominantly" from the efforts of others. *See SEC v. International Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C.Cir.1992).

6. As one commentator has described it, this element of the *Howey* test focuses on the investor's activities in the investment.

If the investor is intimately involved in the running of the business, then he or she can affect the return received and is likely to have access to information regarding the investment's condition. This type of investor has no need for the enhanced disclosure required by the [Securities] Acts. If, on the other hand, the investor is an outsider whose profits depend on exertions by third parties, the disclo-

sure policies of the Acts are directly implicated.

Maura K. Monaghan, Note, *An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis*, 63 Fordham L.Rev. 2135, 2149 (1995). Because the court does not believe that the "control" vested in the investors is sufficient to ensure access to information and control of the investment, the protections offered to investors by the securities laws is warranted.

7. Defendants argue that pre-purchase activities cannot alone support a finding that investors' profits derive from the activities of LPI. The court agrees and does not now find that LPI's pre-closing activities alone are sufficient to sustain this finding. Instead, the court relies on the pre-closing activities in addition to the post-closing activities that LPI continues to perform.

are found to be investment contracts, LPI is nonetheless exempt from registration requirements under a private offerings exemption. Defendants argue that their viatical settlements fall under the generic exemption from registration, section 4(2) of the Securities Act (15 U.S.C. § 77d(2)), as well as the "safe harbor" created by Rule 506 of the Securities Act (17 C.F.R. § 230.501–230.508). The SEC promulgated Rule 506 under the authority of section 4(2) in order to provide investors with a safe harbor to be certain that they can avoid registration requirements. Failure to comply with Rule 506 does not mean that the offering cannot qualify as exempt under section 4(2); in other words, when an issuer tries to comply with Rule 506 but fails, the issuer may still rely on the statutory exemption of section 4(2).

Defendants argue to the court that their operations can easily be altered to comply with Rule 506. Defendants do not, however, claim that their procedures currently comply with the rigid requirements of the Rule. The Rule contains administrative as well as substantive requirements that LPI has proposed, but has not yet implemented. This court need not speculate as to whether defendants will be able to conform their operations to the Rule's requirements because defendants do not argue that they now comply with them. Accordingly, whether LPI can meet the Rule's requirements in the future is irrelevant to whether LPI complies with the law now.

■ With respect to the generic exemption under section 4(2) of the securities act, defendants appear to contend that their operations, as they currently exist, qualify for this exemption. Thus, this issue is properly before the court. The court now holds that the defendants' operations to do not qualify for this exemption. To determine whether LPI's offerings qualify for this exemption, the court looks to the seminal case of *SEC v. Ralston Purina, Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). In that case, the Supreme Court determined that the test for whether an offering should be exempt is whether the offerees could "fend" for themselves and whether the offerees had access to the same information that registration would

provide. *Id.* Subsequent case law has established a number of factors that a court should consider in determining whether an offering should be exempt. For example, courts consider the number of offerees, the relationship of the offerees to each other and the issuer, the manner of the offering (that is, solicitation), information disclosure or access, and the sophistication of the offerees. *See Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir.1984) (Sneed, J.). "The party claiming the exemption must show that it is met not only with respect to each purchaser, but also with respect to each offeree." *Id. (citing SEC v. Murphy*, 626 F.2d 633, 644–45 (9th Cir.1980)).

The court need look no further than the sheer number of LPI's offerees to find that defendants are precluded from invoking the exemption of section 4(2). "To claim the private offering exemption, evidence of the exact number and identity of all offerees must be produced." *Id. (quoting SEC v. Continental Tobacco Co. of South Carolina*, 463 F.2d 137, 161 (5th Cir.1972)). The focus under section 4(2) is on the number of offerees, not on the number of purchasers. In an attempt to show that defendants can identify all offerees, they argue that *"once a purchaser agrees to participate in a viatical settlement ... he or she receives a letter from Life Partners 'reserving' a particular policy or fractional interest for that purchaser pending his or her acceptance within a specified time period."* Def's Surreply at 10 n. 3 (emphasis added). From this, defendants argue that all "potential" purchasers are identified.

Defendants misconstrue who the offerees really are. The offerees are not limited to those investors who "agree[ ] to participate in a viatical settlement." Offerees include all people that LPI and its licensees solicit to make that decision. Because the defendants have the burden of identifying all offerees, see *Henderson v. Hayden, Stone Inc.*, 461 F.2d 1069 (5th Cir.1972), and because the court finds that defendants cannot provide this information, defendants' offerings do not qualify for exemption under section 4(2).

The court thus holds that despite the defendants' revised procedures and changes,

their viatical settlements are still an investment contract within the meaning of the securities laws.

### B. *Contempt.*

In its motion, the SEC asks this court to hold defendants in civil contempt for their failure to comply with federal securities laws. In particular, the SEC contends that defendants have and continue to violate this court's orders to bring their operations into compliance, to transfer the ownership of the policies to the investors, and to refrain from falsehood and deception. The SEC premises its contempt motion on the following allegations: (1) LPI and Pardo have not changed the "essential character" of the investment products that they sell; (2) defendants have engaged in a disinformation campaign in the form of misleading press releases in violation of Rule 10b–5; and (3) the SEC claims that at the time of their motion, LPI was still the record owner of many of the policies.

■ This court has the power hold a party in civil contempt in order to enforce compliance with its lawful orders. *See Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966). Contempt must be shown by clear and convincing evidence, that is, the SEC must show that the defendants continue to violate "a definite and specific court order requiring [the defendants] to perform or refrain from performing a particular act or acts with knowledge of that order." *Whitfield v. Pennington,* 832 F.2d 909, 913 (5th Cir.1987), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988) (*quoting SEC v. First Financial Group of Texas, Inc.,* 659 F.2d 660, 669 (5th Cir.1981). However, the "extraordinary nature" of the remedy of civil contempt leads courts to "impose it with caution." *Joshi v. Professional Health Services, Inc.,* 817 F.2d 877, 879 n. 2 (D.C.Cir. 1987). Moreover, contempt is not warranted if there are any grounds for doubt as to the wrongfulness of the defendants' conduct. *MAC Corp. v. Williams Patent Crusher & Pulverizer Co.,* 767 F.2d 882, 885 (Fed.Cir. 1985) (*quoting California Artificial Stone Paving Co. v. Molitor,* 113 U.S. 609, 613, 5 S.Ct. 618, 619, 28 L.Ed. 1106 (1885)).

■ Upon examination of the allegations of the SEC and the response of Pardo and LPI, the court concludes that contempt is not warranted at this time and shall deny the SEC's motion. The court agrees with the SEC that an oral hearing on this motion is not necessary.

#### 1. *Order To Bring Operations Into Compliance.*

In its effort to show that the defendants have not complied with the court's order to bring their operations into compliance with federal securities laws, the SEC argues that the changes made by LPI and Pardo are superficial and do nothing to bring their viatical settlements out from under the definition of an investment contract. As discussed above, the court agrees that the defendants have not yet complied with the securities laws; however, the defendants' failure to achieve full compliance does not support a claim for contempt. The SEC's request for contempt is premised on their misunderstanding of this court's orders. Although the SEC asked the court in August to order the defendants to cease all operations until defendants fully complied with the securities laws, the court declined to do so. The court believed that a disruption of LPI's business was unnecessary. Further, in the court's September 29 order, the court directed Pardo to file a sworn report "detailing the steps which have been or will be taken to bring Defendants' offerings into compliance." As with the August order, this order contemplated that the defendants would continue their operations while completing the process of restructuring their transactions to comply with the law. These orders contemplate that LPI would have a reasonable period of time to bring their operations into compliance.

Once the orders are viewed in the proper context, all allegations raised by the SEC regarding the defendants' non-compliance with the federal securities laws do not give rise to a finding of contempt. The court is satisfied that following both orders, LPI took steps toward compliance so as to not display contempt for this court and its mandate.

### 2. *The Transfer of Ownership.*

■ The SEC asserts that as of the filing of their contempt motion, the defendants had not completed the process of transferring ownership of the policies to the individual investors. Accordingly, the SEC asks this court to hold the defendants in contempt to compel their compliance with the court's order that required the transfer of ownership. However, based upon the affidavits submitted by the defendants, the court finds that defendants have since completed the transfer of ownership of the policies to the individual investors. Thus, there is no basis for now holding defendants in civil contempt of court on this issue. Civil contempt is to compel compliance; defendants have complied.

### 3. *The "Disinformation Campaign".*

In its August order, this court enjoined the defendants from engaging in fraudulent or deceitful practices in connection with the sale of securities. Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated thereunder provided the basis for this order. The SEC now alleges that a series of press releases issued by defendants and a licensee of the defendants violated this order by attempting to mislead readers regarding the status of this action. The court has examined each of the allegedly misleading press releases and finds that the SEC's allegations are groundless. The relief sought by the SEC through the contempt device, requiring defendants to issue corrective press releases, is not necessary. Thus, the SEC's motion for contempt on this issue shall also be denied.

### C. *Order to Cease Operations.*

■ By the accompanying order of this date, the court shall enjoin defendants, pending a final judgment on the merits, from selling any further viatical settlements to investors until they have complied with the registration requirements under the securities laws. Although the court is fully aware of the benefit provided by LPI to victims of AIDS, the court cannot ignore the protections afforded to investors by Congress through the securities laws. Defendants argue that not only have none of its investors complained about LPI or its viatical settlements, but also that by requiring a public registration scheme for its viatical settlements, this court will actually create more risk for investors. However, this is not a decision for this court to make. The court finds today that LPI's viatical settlements are investment contracts under *Howey;* accordingly, LPI must comply with securities laws.

Accordingly, the court shall deny the SEC's motion for contempt. However, the court shall grant the SEC's motion to compel discovery, and it shall alter its August 30, 1995, order so as to enjoin the defendants from selling unregistered securities in the form of fractional interests in insurance policies on the lives of persons with a terminal illness. A separate order shall issue this date.

### ORDER

This matter comes before the court on the plaintiff's motion for contempt and to compel discovery. For the reasons set forth in the accompanying memorandum opinion of the date, it is hereby

ORDERED that

(1) Plaintiff's motion to hold defendants Life Partners, Inc. and Brian D. Pardo in civil contempt is DENIED;

(2) Plaintiff's motion to compel discovery is GRANTED, and within 10 days of this order, defendants Life Partners, Inc. and Brian D. Pardo shall provide full, complete, and detailed answers to all interrogatories in plaintiff's First Set of Interrogatories, and shall produce to the SEC in Washington all documents requested in plaintiff's First Request For Production of Documents; and

(3) The court's August 30, 1995, order shall be amended as follows:

Defendants Life Partners Inc. and Brian D. Pardo and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, and each of them, be and hereby are preliminarily enjoined from, directly or indirectly, offering or selling un-

registered securities in the form of investment contracts representing fractional interests in the death benefits under insurance policies written on the lives of persons with terminal illnesses.

SO ORDERED.