**SECURITIES AND EXCHANGE COMMISSION, Appellee,**

v.

**INTERNATIONAL LOAN NETWORK, INC., et al., Appellants.**

**No. 91–5306.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 18, 1992.

Decided July 10, 1992.

---

**1305**

Bruce Fein, for appellants.

Lucinda O. McConathy, Asst. Gen. Counsel, S.E.C., with whom James R. Doty, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Randall W. Quinn, Special Counsel, and Paul Gonson, Sol., were on the brief, for appellee.

Before RUTH BADER GINSBURG, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

[T]he movement of money creates wealth. What we believe is that if you organize people and get money moving, it can actually create wealth.
—Melvin J. Ford[1]

Money is always there but the pockets change.
—Gertrude Stein[2]

Appellants Melvin J. Ford and Odell Mundey appeal from the district court's opinion holding that the operation of certain investment programs by the International Loan Network, Inc. (ILN) constitutes the fraudulent offer or sale of unregistered securities in violation of federal securities law and from the preliminary injunction, based thereon, prohibiting the appellants from continuing to operate those programs and freezing ILN's assets. For the reasons set out below, we affirm the trial court's opinion and preliminary injunction.

Ford is the founder and president of ILN, which he describes as "a financial distribution network whose members believe that through the control of money and through the control of real estate you can accumulate wealth and become financially independent." JA 131. To promote ILN's various financial enrichment programs, Ford travels throughout the country addressing ILN members and prospective members, with evangelical fervor, at revival-style "President's Night" gatherings.

1. Los Angeles, California President's Night, April 18, 1991. Joint Appendix (JA) 150.

2. As attributed in Michael C. Thomsett, *A Treasury of Business Quotations* 102 (1990).

Mundey is vice president of ILN. ILN's programs, which are described at length in the district court's opinion, *see SEC v. International Loan Network, Inc.,* 770 F.Supp. 678, 682–87 (D.D.C.1991), may be summarized as follows:

*(1) Memberships:* First, ILN sells "basic" and "club" memberships. A basic membership costs $125 and entitles the member to various benefits including discount shopping, travel and car rental. A basic member can purchase a club membership for an additional $100, $500, or $1,000 payment and receive in return investment advice through newsletters, seminars, and so on. In addition, Club members at the $500 and $1,000 level are entitled to participate in ILN's "Property Rights Acquisition" program, which is described *infra.*

*(2) Capital Fund Bonus System:* The Capital Fund Bonus System (CFBS) is a pyramid sales program that Ford has characterized as "the most powerful financial system since banking." JA 150. To participate in this program, a person signs on as an "Individual Representative" (IR) to sell ILN memberships for a fifty per cent commission. In addition, he receives fifteen per cent commissions on sales made by members he recruits and by their recruits and ten per cent commissions on sales by the next two levels of recruits "downline."

*(3) Property Rights Acquisition Program:* The Property Rights Acquisition (PRA) program is the fourth in a series of related ventures. In its first three incarnations, as more fully described by the district court, 770 F.Supp. at 683–85, the program promised large cash payments or valuable real property rights within 180 days to qualified members who made an immediate cash payment of $1,000 to $10,000. The present program, begun in March, 1991, is substantially more modest, at least on paper. According to the program's brochure, the purchaser of a PRA now obtains only instructional videotapes, the right to enroll in real estate courses and access to a computer listing service.[3]

*(4) Maximum Consideration Program:* The Maximum Consideration program is described in ILN's written materials as a "special award opportunity for representatives of ILN who have evidenced that they are in the process of acquiring real property for purposes other than a personal residence." JA 108. To be eligible for the award, a person must (1) sell $3,000 worth of PRA memberships, (2) make an earnest money deposit on an agreement to purchase real estate for other than residential use, which can be satisfied by a PRA purchase, and (3) sign an "acknowledgment" form that states, *inter alia:* "I agree that Maximum Consideration is a special award paid at the sole discretion of ILN and only the top ten qualifiers are guaranteed an award," JA 111. Each of the top ten qualifiers is guaranteed an award of at least $5,000, while the discretionary awards to others may reach five times their original PRA purchase price or real estate contract deposit, "based upon PRA sales volume, the amount of money invested, and the length of time they have been in the program." 770 F.Supp. at 686. According to Ford, an individual purchasing $16,000 worth of PRAs could receive an award of up to $80,000 because "all of a sudden the velocity of money increases to such a point, the ability to create wealth expands to such a degree, that we could come back and give somebody an award for up to $80,000." JA 165.

*(5) Subsidiaries:* ILN also operates several subsidiaries including a real estate acquisition company, an educational scholarship service, a financial advisory service, a real estate brokerage service and a printing and graphics company. Each of these is funded, at least in part, by ILN and some of them provide services for ILN members as well as the general public.

---

**3.** Without making any finding on the matter, the district court suggested the possibility that the PRA program might still be orally promoted as an investment contract similar to its predecessors. 770 F.Supp. at 693.

On May 15, 1991, the SEC commenced this action against ILN, Ford and Mundey, alleging that (1) they were selling unregistered securities in violation of section 5 of the Securities Act of 1933 (1933 Act), 15 U.S.C. § 77e, and (2) they were doing so fraudulently in violation of section 17(a) of the 1933 Act and section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 77q(a), 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5. On May 15, 1991, the district court issued a temporary restraining order which, *inter alia,* prohibited ILN, Ford, Mundey or any other ILN agents from offering or selling securities without registration or by fraudulent means and froze ILN's, Ford's and Mundey's assets.[4] On July 18, 1991, following a three-day evidentiary hearing, the district court issued an opinion holding that (1) the CFBS, the predecessors to the current PRA program and the Maximum Consideration program all involved the offer or sale of unregistered securities in violation of section 5 of the 1933 Act, 770 F.Supp. at 691–93,[5] and (2) the marketing of these securities was accompanied by material misrepresentations in violation of sections 17(a) of the 1933 Act, section 10(b) of the 1934 Act and Rule 10b–5. *Id.* at 693–96. Based on these holdings, the court concluded a preliminary injunction was required to continue the prohibition on the marketing of these programs and the freeze of ILN's assets. *Id.* at 696–97. Accordingly, on July 26, 1991, the court issued a preliminary injunction extending that relief.

Ford and Mundey appeal the district court's opinion and injunction on the grounds that (1) ILN's programs do not involve the offer or sale of securities and (2) they made no misrepresentations in promoting those programs.[6] We find neither argument persuasive.

## I.

First, the appellants assert the district court erroneously concluded that the CFBS and the Maximum Consideration program involve the offer or sale of securities, namely investment contracts, so as to come within the purview of the 1933 and 1934 acts.[7] We disagree.

■ The Supreme Court set out the now-familiar test for identifying investment contracts in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946): "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." The district court properly applied this tripartite test and we affirm both its conclusions and its analysis. *See* 770 F.Supp. at 688–93.

■ Regarding the CFBS, we perceive no error in the district court's holding that all three prongs of the *Howey* Test are satisfied. The appellants argue strenuously that the program involves no investment of money because an individual need make no payment to ILN to become an IR. The district court, however, found otherwise. Based on a President's Night transcript and the testimony of witnesses "who ha[d] repeatedly heard [Ford] speak," the court concluded that "the intent is for a person to become a member first and then recruit new members." 770 F.Supp. at 691; *see also id.* at 682 ("[I]t is equally clear that the Capital Fund is marketed so that a person will first join the organization himself and then recruit others to join"). In particular, the court noted Ford's oft re-

---

4. That order was amended on May 28, 1991, to free Ford's and Mundey's personal assets.

5. The court concluded that the basic and club membership sales by themselves involve no securities, 770 F.Supp. at 691, but noted that "club memberships do not currently have an existence apart from the Capital Fund Bonus System," *id.* at 692 n. 14. The court further found it unnecessary "at this preliminary stage" to decide whether the current PRA program involves se-

curities because that program is "inextricably intertwined" with the Maximum Consideration program, which does. *Id.* at 693.

6. Former appellant ILN has withdrawn its appeal. *Stipulation of Dismissal of ILN as Appellant* (filed February 26, 1992).

7. They do not challenge the district court's holding that the three predecessors to the current PRA program involved securities.

peated refrain: "you come in, then you bring in your wife and your kids." *Id.* at 691. We find this evidence more than sufficient to support the court's finding.

As for the common enterprise element, the fortunes of investors are clearly linked to each other and to the success of ILN as an enterprise. The CFBS generates income for its investors, and for the appellants, only through constant expansion of membership, which depends on individual recruiting and the appeal of Ford's larger marketing campaign. Thus, the court properly found the CFBS satisfies the second prong of the *Howey* test as well.[8]

Finally, profits for CFBS investors are expected to accrue, if not solely, at least predominantly from the efforts of others, namely of the downline members from whose fees an IR expects to derive most of his wealth and of the appellants who created, promote and operate ILN's programs.[9] Thus, the CFBS satisfies the third prong of the *Howey* test as well. *See SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir.) (interpreting third prong of *Howey* test broadly to require only that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise"), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir.1974) (adopting *Glenn W. Turner* interpretation of *Howey*); *Baurer v. Plan-*

*ning Group, Inc.*, 669 F.2d 770 (D.C.Cir. 1981) (applying *Glenn W. Turner* test).

■ The Maximum Consideration program presents an even clearer picture of a classic investment contract. A participant in that program typically invests money in a PRA[10] and is led to expect a large annual "award" with only the modest additional effort of selling $3,000 worth of PRAs. The appellants urge strenuously that this program does not involve an investment contract because no return is ever "guaranteed." We find this argument without merit. Very few investments "guarantee" a return—all that *Howey* requires is a "reasonable expectation of profits." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). The evidence clearly supports such an expectation here. *See* 770 F.Supp. at 686.

### II.

■ Next, the appellants contend the district court erroneously held that they violated the fraud provisions of the securities acts by making material misrepresentations in the offer or sale of the investment contracts involved. The district court concluded:

> With respect to whether misrepresentations have been made concerning ILN's programs, the evidence is clear that ILN is nothing more than a glorified chain letter, destined to collapse of its own weight. Despite the inevitability of this

---

**8.** In fact the evidence suggests that the CFBS and Maximum Consideration program may form a single, interlocking investment enterprise. *See* JA 163–65.

**9.** The evidence suggests that at least in some cases Ford's President's Night promotions are instrumental in consummating an IR's recruitment of new members. The district court noted: "[T]o be credited with recruiting a new member may involve as little as inviting someone to an ILN meeting or President's Night. If the ILN marketing representatives or Melvin Ford himself are successful in persuading the potential recruit to join, the person who extended the invitation, otherwise known as the 'sponsor,' will be credited as having made the recruitment and will earn income from it." 770 F.2d at 692; *see also* JA 156–57.

**10.** Although the program literature permitted either purchase of a PRA or any earnest money deposit on an agreement to purchase nonresidential real estate, *see* JA 108, Ford marketed the program somewhat differently. At a President's Night meeting, he told his audience:

> [I]f you want to get that award that we call "Maximum Consideration," you have to have one of those PRAs we just talked about. So you have to have a—actually, technically, you could have a real estate contract or the PRA we just discussed.
>
> But let me underline—after all, ILN sells PRAs, right. So we should be able to promote our own business, so, if you have a PRA, you are eligible to participate in Maximum Consideration.

JA 166–67.

outcome, potential investors were, until the issuance of the temporary restraining order in this case, continuing to be promised great wealth through their participation in the ILN. The pyramid nature of the organization was never fully revealed to them.

770 F.Supp. at 694. The appellants assail this conclusion on two grounds, neither of which is worth a Continental.[11]

First, the appellants assert there is no evidence either that representations of profitability were made or that the ventures do not in fact produce profits. We disagree. The record is replete with Ford's descriptions of the profits available from ILN's programs, while the very nature of those programs ensures that such profits will not extend to all investors. As the Fifth Circuit has noted:

> The essential vice of chain or pyramid distribution schemes has been well documented. For example, if the founder recruited five distributors in the first month and if those five each recruited five more distributors in month two, and if each of these subsequent recruits enticed five people to join in the month following his own recruitment, over 244 million new distributors would be recruited in the twelfth month. Obviously, this would be impossible in a nation of only 220 million people. Equally as obvious is the fact that those who have the greatest risk of loss are those who enter the pyramid when the market is closest to saturation.... The disclosure which would be necessary to inform a new investor of his prospects for success or failure would have to change almost daily in order to reflect the acquisition of new distribu-

tors. Needless to say, there would be substantial administrative obstacles connected with any such regime of disclosure.

*Piambino v. Bailey*, 610 F.2d 1306, 1318 n. 9 (5th Cir.1980); *see also* Arthur Allen Leff, *Swindling and Selling* 70 (1976).[12]

Finally, Mundey asserts that he cannot personally be credited with any misrepresentations because he did not personally make any. We disagree, finding ample evidence to hold Mundey liable for ILN's misrepresentations. As the SEC points out, the evidence shows that Mundey, ILN's vice president and 25% owner, was intimately involved with its daily operations and controlled all disbursements of its funds. *See* JA 116, 118. These facts support the inference that Mundey knew of Ford's representations and of the inevitability of ILN's investors' losses. The district court therefore committed no error in finding him jointly responsible for ILN's fraudulent sale of securities. *Cf. Gross v. SEC*, 418 F.2d 103, 107 (2d Cir.1969) (concluding that vice president aided and abetted firm's violation of anti-fraud provisions "[o]n the basis of [his] participation in the management of the firm and his knowledge of the course of conduct in which his firm was engaging").

For the preceding reasons, the district court's opinion and its preliminary injunction are

*Affirmed.*

**11.** The phrase "not worth a Continental" is a variant of "not worth a Continental dam." *Respectfully Quoted: A Dictionary of Quotations Requested from the Congressional Research Service* 229 (Suzy Platt ed. 1989). As one source explains:

> "'Not worth a Continental dam' had its origin about this time [1780]. It is not a profane expression. A 'dam' is an Indian coin of less value than one cent and a Continental one cent was next to worthless when it took six pounds, or about thirty dollars to buy a 'warm dinner.'"

*Id.* (quoting Oliver Taylor, *Historic Sullivan* 97 (1909)).

**12.** In fact, the district court noted in its opinion: "According to the SEC's as-yet-undisputed allegations, the ILN has $500 million worth of obligations to investors, but has only $4 million in liquid assets, $5 million in real property, and tax lien certificates for property worth $75 million in assessed value." 770 F.Supp. at 697. ILN has since filed for Chapter 11 bankruptcy. *See Stipulation of Dismissal of ILN as Appellant* (filed February 26, 1992).