# United States Court of Appeals
## For the First Circuit

---

Nos. 01-1176
01-1332

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellant,

v.

SG LTD. ET AL.,

Defendants, Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Selya and Lipez, Circuit Judges.

---

Mark Pennington, Assistant General Counsel, with whom David M. Becker, General Counsel, Jacob H. Stillman, Solicitor, and Meyer Eisenberg, Deputy General Counsel, were on brief, for appellant.

Daniel I. Small, with whom Meaghan E. Barrett and Butters, Brazilian & Small, LLP were on brief, for appellees.

---

September 13, 2001

---

**SELYA, Circuit Judge.** These appeals — procedurally, there are two, but for all practical purposes they may be treated as one — require us to determine whether virtual shares in an enterprise existing only in cyberspace fall within the purview of the federal securities laws. SG Ltd., a Dominican corporation, and its affiliate, SG Trading Ltd. (collectively, "SG" or "defendants"), asseverate that the virtual shares were part of a fantasy investment game created for the personal entertainment of Internet users, and therefore, that those shares do not implicate the federal securities laws. The Securities and Exchange Commission ("the SEC"), plaintiff below and appellant here, counters that substance ought to prevail over form, and that merely labeling a website as a game should not negate the applicability of the securities laws. The district court accepted the defendants' view and dismissed the SEC's complaint. SEC v. SG Ltd., 142 F. Supp. 2d 126 (D. Mass. 2001). Concluding, as we do, that the SEC alleged sufficient facts to state a triable claim, we reverse.

## I. BACKGROUND

We take the facts as alleged in the SEC's first amended complaint (shorn, however, of empty rhetoric). Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

The underlying litigation was spawned by SG's operation of a "StockGeneration" website offering on-line denizens an opportunity to purchase shares in eleven different "virtual companies" listed on the website's "virtual stock exchange." SG arbitrarily set the purchase and sale prices of each of these imaginary companies in biweekly "rounds," and guaranteed that investors could buy or sell any quantity of shares at posted prices. SG placed no upper limit on the amount of funds that an investor could squirrel away in its virtual offerings.

The SEC's complaint focused on shares in a particular virtual enterprise referred to by SG as the "privileged company," and so do we. SG advised potential purchasers to pay "particular attention" to shares in the privileged company and boasted that investing in those shares was a "game without any risk." To this end, its website announced that the privileged company's shares would unfailingly appreciate, boldly proclaiming that "[t]he share price of [the privileged company] is supported by the owners of SG, this is why its value constantly rises; on average at a rate of 10% monthly (this is approximately 215% annually)." To add plausibility to this representation and to allay anxiety about future pricing, SG published prices of the privileged company's shares one month in advance.

-4-

While SG conceded that a decline in the share price was theoretically possible, it assured prospective participants that "under the rules governing the fall in prices, [the share price for the privileged company] cannot fall by more than 5% in a round." To bolster this claim, it vouchsafed that shares in the privileged company were supported by several distinct revenue streams. According to SG's representations, capital inflow from new participants provided liquidity for existing participants who might choose to sell their virtual shareholdings. As a backstop, SG pledged to allocate an indeterminate portion of the profits derived from its website operations to a special reserve fund designed to maintain the price of the privileged company's shares. SG asserted that these profits emanated from four sources: (1) the collection of a 1.5% commission on each transaction conducted on its virtual stock exchange; (2) the bid-ask spread on the virtual shares; (3) the "skillful manipulation" of the share prices of eight particular imaginary companies, not including the privileged company, listed on the virtual stock exchange; and (4) SG's right to sell shares of three other virtual companies (including the privileged company). As a further hedge against adversity, SG alluded to the availability of auxiliary stabilization funds which could be

tapped to ensure the continued operation of its virtual stock exchange.

SG's website contained lists of purported "big winners," an Internet bulletin board featuring testimonials from supposedly satisfied participants, and descriptions of incentive programs that held out the prospect of rewards for such activities as the referral of new participants (e.g., SG's representation that it would pay "20, 25 or 30% of the referred player's highest of the first three payments") and the establishment of affiliate websites.

At least 800 United States domiciliaries, paying real cash, purchased virtual shares in the virtual companies listed on the defendants' virtual stock exchange. In the fall of 1999, over $4,700,000 in participants' funds was deposited into a Latvian bank account in the name of SG Trading Ltd. The following spring, more than $2,700,000 was deposited in Estonian bank accounts standing in the names of SG Ltd. and SG Perfect Ltd., respectively.

In late 1999, participants began to experience difficulties in redeeming their virtual shares. On March 20, 2000, these difficulties crested; SG unilaterally suspended all pending requests to withdraw funds and sharply reduced participants' account balances in all companies except the

privileged company.  Two weeks later, SG peremptorily announced a reverse stock split, which caused the share prices of all companies listed on the virtual stock exchange, including the privileged company, to plummet to 1/10,000 of their previous values.  At about the same time, SG stopped responding to participant requests for the return of funds, yet continued to solicit new participants through its website.

The SEC undertook an investigation into SG's activities, which culminated in the filing of a civil action in federal district court.  The SEC's complaint alleged, in substance, that SG's operations constituted a fraudulent scheme in violation of the registration and antifraud provisions of the federal securities laws.  See Securities Act of 1933 § 5(a), (c), 15 U.S.C. § 77e(a), (c) (offer, sale, or delivery of unregistered securities); id. § 17(a), 15 U.S.C. § 77q(a) (fraud in offer or sale of securities);  Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b); SEC Rule 10b-5, 17 C.F.R. 240.10b-5 (fraud in connection with purchase or sale of securities).  The SEC sought injunctive relief, disgorgement, and civil penalties.

The district court entered a temporary restraining order (subsequently converted to a preliminary injunction) blocking SG's operation of the website pendente lite.  The court

also instituted an asset freeze that infrigidated approximately $5,500,000. The SEC's success was short-lived; after some skirmishing, not relevant here, the district court granted SG's motion to dismiss the complaint for failure to state a cognizable claim on the ground that the virtual shares were a clearly marked and defined game lacking a business context. See SEC v. SG Ltd., 142 F. Supp. 2d at 131. The SEC immediately appealed, and we issued a stay keeping both the preliminary injunction and the asset freeze in place for the time being.

These appeals hinge on whether the district court erred in ruling that transactions in the privileged company's shares did not constitute transactions in securities. In the pages that follow, we explore the makeup of that particular type of security known as an investment contract; examine the district court's rationale; and apply the tripartite "investment contract" test to the facts as alleged. Because the lower court dismissed the SEC's first amended complaint for failure to state a claim upon which relief might be granted, Fed. R. Civ. P. 12(b)(6), we conduct a de novo review, "accepting as true all well-pleaded factual averments and indulging all reasonable inferences in the plaintiff's favor." Aulson, 83 F.3d at 3. If the facts contained in the complaint, viewed in this favorable light, justify recovery under any applicable legal theory, we

must set aside the order of dismissal. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Aulson, 83 F.3d at 3.

## II.  THE LEGAL LANDSCAPE

These appeals turn on whether the SEC alleged facts which, if proven, would bring this case within the jurisdictional ambit of the federal securities laws. Consequently, we focus on the type of security that the SEC alleges is apposite here:  investment contracts.

### A.  Investment Contracts.

The applicable regulatory regime rests on two complementary pillars:  the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78mm.  These statutes employ nearly identical definitions of the term "security."  See Securities Act of 1933 § 2(a)(1), 15 U.S.C. § 77b(a)(1); Securities Exchange Act of 1934 § 3(a)(10), 15 U.S.C. § 78c(a)(10).  Congress intended these sweeping definitions, set forth in an appendix hereto, to encompass a wide array of financial instruments, ranging from well-established investment vehicles (e.g., stocks and bonds) to much more arcane arrangements.  SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 351 (1943).  Included in this array is the elusive, essentially protean, concept of an investment contract.

Judicial efforts to delineate what is — and what is not — an investment contract are grounded in the seminal case of <u>SEC v. W. J. Howey Co.</u>, 328 U.S. 293 (1946). The <u>Howey</u> Court established a tripartite test to determine whether a particular financial instrument constitutes an investment contract (and, hence, a security). This test has proven durable. Under it, an investment contract comprises (1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party. <u>Id.</u> at 298-99. This formulation must be applied in light of the economic realities of the transaction. <u>United Hous. Found., Inc.</u> v. <u>Forman</u>, 421 U.S. 837, 851-52 (1975); <u>Tcherepnin</u> v. <u>Knight</u>, 389 U.S. 332, 336 (1967); <u>Futura Dev. Corp.</u> v. <u>Centex Corp.</u>, 761 F.2d 33, 39 (1st Cir. 1985). In other words,

> substance governs form, and the substance of an investment contract is a security-like interest in a "common enterprise" that, through the efforts of the promoter or others, is expected to generate profits for the security holder, either for direct distribution or as an increase in the value of the investment.

<u>Rodriguez</u> v. <u>Banco Cent. Corp.</u>, 990 F.2d 7, 10 (1st Cir. 1993) (citations omitted).

The Supreme Court has long espoused a broad construction of what constitutes an investment contract,

aspiring "to afford the investing public a full measure of protection." Howey, 328 U.S. at 298. The investment contract taxonomy thus "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Id. at 299.

The Howey test has proven to be versatile in practice. Over time, courts have classified as investment contracts a kaleidoscopic assortment of pecuniary arrangements that defy categorization in conventional financial terms, yet nonetheless satisfy the Howey Court's three criteria. See, e.g., id. (holding that sale of citrus groves, in conjunction with service contract, qualifies as an investment contract); Teague v. Bakker, 35 F.3d 978, 981, 990 (4th Cir. 1994) (same re purchase of life partnership in evangelical community); Long v. Shultz Cattle Co., 881 F.2d 129, 132 (5th Cir. 1989) (same re cattle-feeding and consulting agreement); Miller v. Cent. Chinchilla Group, 494 F.2d 414, 415, 418 (8th Cir. 1974) (same re chinchilla breeding and resale arrangement).

## B.  The District Court's Rationale.

We pause at this juncture to address the district court's rationale. Relying upon a dictum from Howey discussing

-11-

"the many types of instruments that in our commercial world fall within the ordinary concept of a security," 328 U.S. at 299 (quoting legislative history), the district court drew a distinction between what it termed "commercial dealings" and what it termed "games." SEC v. SG Ltd., 142 F. Supp. 2d at 131. Characterizing purchases of the privileged company's shares as a "clearly marked and defined game," the court concluded that since that activity was not part of the commercial world, it fell beyond the jurisdictional reach of the federal securities laws. Id. In so ruling, the court differentiated SG's operations from a classic Ponzi or pyramid scheme on the ground that those types of chicanery involved commercial dealings within a business context. Id.

We do not gainsay the obvious correctness of the district court's observation that investment contracts lie within the commercial world. Contrary to the district court's view, however, this locution does not translate into a dichotomy between business dealings, on the one hand, and games, on the other hand, as a failsafe way for determining whether a particular financial arrangement should (or should not) be characterized as an investment contract. Howey remains the touchstone for ascertaining whether an investment contract exists — and the test that it prescribes must be administered

without regard to nomenclature.  See Int'l Bhd. of Teamsters v. Daniel, 439 U.S. 551, 561 (1979); see also Forman, 421 U.S. at 851-52 (warning against reliance on "the names that may have been employed by the parties" to identify a particular investment); cf. William Shakespeare, Romeo & Juliet, act 2, sc. 2 (circa 1597) ("A rose by any other name would smell as sweet.").  As long as the three-pronged Howey test is satisfied, the instrument must be classified as an investment contract. Howey, 328 U.S. at 301.  Once that has occurred, "it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value."  Id.  It is equally immaterial whether the promoter depicts the enterprise as a serious commercial venture or dubs it a game.

A fairly recent Supreme Court opinion demonstrates that the "commercial world" to which the Howey Court alluded actually encompasses the total universe of financial instruments available to investors, rather than the subset of financial instruments envisioned by the district court (i.e., "commerce" as opposed to "games").  In that case, Justice Marshall wrote:

> In defining the scope of the market that it wished to regulate, Congress painted with a broad brush.  It recognized the virtually limitless scope of human ingenuity, especially in the creation of "countless and variable schemes devised by those who seek

-13-

> the use of the money of others on the
> promise of profits," and determined that the
> best way to achieve its goal of protecting
> investors was "to define 'the term
> "security" in sufficiently broad and general
> terms so as to include within that
> definition the many types of instruments
> that in our commercial world fall within the
> ordinary concept of a security.'" Congress
> therefore did not attempt precisely to cabin
> the scope of the Securities Acts. Rather,
> it enacted a definition of "security"
> sufficiently broad to encompass virtually
> any instrument that might be sold as an
> investment.

Reves v. Ernst & Young, 494 U.S. 56, 60-61 (1990) (citations omitted). This expansive language, coupled with Congress's sweeping definitions of "security," persuade us to reject the district court's use of Howey's "commercial world" reference as a limiting principle.

To sum up, Howey supplies the appropriate template for identifying investment contracts within the overarching ambit of the federal securities laws. Contrary to the district court's conclusion, this template admits of no exception for games or gaming. Thus, the language on SG's website emphasizing the game-like nature of buying and selling virtual shares of the privileged company does not place such transactions beyond the long reach of the federal securities laws.

## III. ADMINISTERING THE TRIPARTITE TEST

What remains is to analyze whether purchases of the privileged company's shares constitute investment contracts. We turn to that task, taking the three Howey criteria in sequence.

## A. **Investment of Money.**

The first component of the Howey test focuses on the investment of money. The determining factor is whether an investor "chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security." Daniel, 439 U.S. at 559. We conclude that the SEC's complaint sufficiently alleges the existence of this factor.

To be sure, SG disputes the point. It argues that the individuals who purchased shares in the privileged company were not so much investing money in return for rights in the virtual shares as paying for an entertainment commodity (the opportunity to play the StockGeneration game). This argument suggests that an interesting factual issue may await resolution — whether participants were motivated primarily by a perceived investment opportunity or by the visceral excitement of playing a game. Nevertheless, this case comes to us following a dismissal under Rule 12(b)(6), and the SEC's complaint memorializes, inter alia,

SG's representation that participants could "firmly expect a 10% profit monthly" on purchases of the privileged company's shares. That representation plainly supports the SEC's legal claim that participants who invested substantial amounts of money in exchange for virtual shares in the privileged company likely did so in anticipation of investment gains. Given the procedural posture of the case, no more is exigible to fulfill the first part of the <u>Howey</u> test.

### B. <u>Common Enterprise</u>.

The second component of the <u>Howey</u> test involves the existence of a common enterprise. Before diving headlong into the sea of facts, we must dispel the miasma that surrounds the appropriate legal standard.

**1. <u>The Legal Standard</u>.** Courts are in some disarray as to the legal rules associated with the ascertainment of a common enterprise. <u>See</u> <u>generally</u> II Louis Loss & Joel Seligman, <u>Securities Regulation</u> 989-97 (3d ed. rev. 1999). Many courts require a showing of horizontal commonality — a type of commonality that involves the pooling of assets from multiple investors so that all share in the profits and risks of the enterprise. <u>See</u> <u>SEC</u> v. <u>Infinity Group Co.</u>, 212 F.3d 180, 187-88 (3d Cir. 2000), <u>cert.</u> <u>denied</u>, 121 S. Ct. 1228 (2001); <u>SEC</u> v. <u>Life Partners, Inc.</u>, 87 F.3d 536, 543 (D.C. Cir. 1996); <u>Wals</u> v.

Fox Hills Dev. Corp., 24 F.3d 1016, 1018 (7th Cir. 1994); Revak v. SEC Realty Co., 18 F.3d 81, 87 (2d Cir. 1994); Curran v. Merrill Lynch, Pierce, Fenner & Smith, 622 F.2d 216, 222, 224 (6th Cir. 1980), aff'd on other grounds, 456 U.S. 353 (1982). Other courts have modeled the concept of common enterprise around fact patterns in which an investor's fortunes are tied to the promoter's success rather than to the fortunes of his or her fellow investors.  This doctrine, known as vertical commonality, has two variants.  Broad vertical commonality requires that the well-being of all investors be dependent upon the promoter's expertise.  See Villeneuve v. Advanced Bus. Concepts Corp., 698 F.2d 1121, 1124 (11th Cir. 1983), aff'd en banc, 730 F.2d 1403 (11th Cir. 1984); SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 478-79 (5th Cir. 1974).  In contrast, narrow vertical commonality requires that the investors' fortunes be "interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties."  SEC v. Glenn W. Turner Enters., 474 F.2d 476, 482 n.7 (9th Cir. 1973).

Courts also differ in the steadfastness of their allegiance to a single standard of commonality.  Two courts of appeals recognize only horizontal commonality.  See Wals, 24 F.3d at 1018; Curran, 622 F.2d at 222, 224.  Two others adhere

exclusively to broad vertical commonality.[1]  See Villeneuve, 698 F.2d at 1124; Koscot, 497 F.2d at 478-79.  The Ninth Circuit recognizes both horizontal commonality and narrow vertical commonality.  See Hocking v. Dubois, 885 F.2d 1449, 1459 (9th Cir. 1989) (en banc).  To complicate matters further, four courts of appeals have accepted horizontal commonality, but have not yet ruled on whether they also will accept some form of vertical commonality.  See Infinity Group, 212 F.3d at 187 n.8; Life Partners, 87 F.3d at 544; Teague, 35 F.3d at 986 n.8; Revak, 18 F.3d at 88.  At least one of these courts, however, has explicitly rejected broad vertical commonality.  See Revak, 18 F.3d at 88.

Thus far, neither the Supreme Court nor this court has authoritatively determined what type of commonality must be present to satisfy the common enterprise element.  We came close in Rodriguez, in which we hinted at a preference for horizontal commonality.  There, promoters selling parcels of land made "strong and repeated suggestions that the surrounding area would develop into a thriving residential community."  990 F.2d at 11. Although we held that the financial arrangement did not

---

[1]We note that broad vertical commonality is an expansive concept which typically overspreads other types of commonality. See Mordaunt v. Incomco, 469 U.S. 1115, 1115-16 (1985) (White, J., dissenting from denial of certiorari).

constitute a security, we implied that an actual commitment by the promoters to develop the community themselves, coupled with the buyers' joint financing of the enterprise, could constitute a common enterprise. See id.

The case at bar requires us to take a position on the common enterprise component of the Howey test. We hold that a showing of horizontal commonality — the pooling of assets from multiple investors in such a manner that all share in the profits and risks of the enterprise — satisfies the test. This holding flows naturally from the facts of Howey, in which the promoter commingled fruit from the investors' groves and allocated net profits based upon the production from each tract. See Howey, 328 U.S. at 296. Adopting this rule also aligns us with the majority view and confirms the intimation of Rodriguez. Last, but surely not least, the horizontal commonality standard places easily ascertainable and predictable limits on the types of financial instruments that will qualify as securities.[2]

**2. Applying the Standard.** Here, the pooling element of horizontal commonality jumps off the screen. The defendants' website stated that: "The players' money is accumulated on the

---

[2]Since the complaint in this case alleges facts sufficient to establish horizontal commonality, see infra Part III(B)(2), we take no view as to whether vertical commonality, in either of its iterations, also may suffice to satisfy the "common enterprise" requirement.

SG current account and is not invested anywhere, because no investment, not even the most profitable one, could possibly fully compensate for the lack of sufficiency in settling accounts with players, which lack would otherwise be more likely."   Thus, as the SEC's complaint suggests, SG unambiguously represented to its clientele that participants' funds were pooled in a single account used to settle participants' on-line transactions.   Therefore, pooling is established.

Of course, horizontal commonality requires more than pooling alone; it also requires that investors share in the profits and risks of the enterprise.  The SEC maintains that two separate elements of SG's operations embody the necessary sharing.  First, it asserts that SG was running a Ponzi or pyramid scheme dependent upon a continuous influx of new money to remain in operation,[3] and argues that such arrangements

---

[3]While the terms "Ponzi" and "pyramid" often are used interchangeably to describe financial arrangements which rob Peter to pay Paul, the two differ slightly.  In Ponzi schemes — named after a notorious Boston swindler, Charles Ponzi, who parlayed an initial stake of $150 into a fortune by means of an elaborate scheme featuring promissory notes yielding interest at annual rates of up to 50% — money tendered by later investors is used to pay off earlier investors.  In contrast, pyramid schemes incorporate a recruiting element; they are marketing arrangements in which participants are rewarded financially based upon their ability to induce others to participate.  The SEC alleges that SG's operations aptly can be characterized under either appellation.

inherently involve the sharing of profit and risk among investors. Second, the SEC construes SG's promise to divert a portion of its profits from website operations to support the privileged company's shares as a bond that ties together the collective fortunes of those who have purchased the shares. While we analyze each of these theories, we note that any one of them suffices to support a finding of commonality.

We endorse the SEC's suggestion that Ponzi schemes typically satisfy the horizontal commonality standard. In Infinity Group, investors contributed substantial sums of money to a trust established by the defendants and received in exchange a property transfer agreement guaranteeing stupendous annual rates of return. 212 F.3d at 184-85. The economic guarantees were based upon the trust's purported performance experience, financial connections, and ability to pool large amounts of money. Id. at 185. Participants were promised that investing in the trust was a risk-free proposition, and that their cash infusions would be repaid in full upon demand. Id. at 184-85. Expected profits were a function of the number of "capital units" held pursuant to the contract with the trust; in turn, the number of capital units allocated to each investor was directly proportional to the size of his or her investment. Id. at 188-89. On these facts, the Third Circuit held that

-21-

horizontal commonality existed, emphasizing that under the plan's terms each investor was entitled to receive returns directly proportionate to his or her investment stake.  Id. at 188.

SG's virtual shares bear striking factual similarities to the financial instruments classified as investment contracts in Infinity Group.  SG's flat 10% guaranteed return applied to all privileged company shares, expected returns were dependent upon the number of shares held, the economic assurances were based on the promoter's ability to keep the ball rolling, the investment was proclaimed to be free from risk, and participants were promised that their principal would be repaid in full upon demand.  Like the Third Circuit, we think that these facts suffice to make out horizontal commonality.

In all events, SG's promise to pay referral fees to existing participants who induced others to patronize the virtual exchange provides an alternative basis for finding horizontal commonality.  The SEC argues convincingly that this shows the existence of a pyramid scheme sufficient to satisfy the horizontal commonality standard.  The most instructive comparison is to SEC v. Int'l Loan Network, 968 F.2d 1304 (D.C. Cir. 1992).  A key element of the defendants' elaborate, multifaceted, financial distribution network in that case was a

pyramid sales program in which participants stood to receive 50% commissions on membership fees paid by individuals whom they recruited, plus lesser commissions on sales by those recruited by their recruits. Id. at 1306. The court of appeals ruled that this structure satisfied the requirements of horizontal commonality. Id. at 1308. In the process, it relied heavily upon the fact that the network generated income only through constant expansion of membership, which depended on individual recruiting and the appeal of the promoter's larger marketing campaign. Id.

Like the investors in Int'l Loan Network, StockGeneration participants who recruited new participants were promised bonuses worth 20%-30% of the recruit's payments. Taking as true the SEC's plausible allegation that the sine qua non of SG's operations was the continued net inflow of funds, the investment pool supporting the referral bonus payments was entirely dependent upon the infusion of fresh capital. Since all participants shared in the profits and risks under this pyramidal structure, it furnishes the sharing necessary to warrant a finding of horizontal commonality.

We will not paint the lily. We conclude, without serious question, that the arrangement described in the SEC's complaint fairly can be characterized as either a Ponzi or

pyramid scheme, and that it provides the requisite profit-and-risk sharing to support a finding of horizontal commonality. Taking as true the SEC's allegation that SG's ability to fulfill its pecuniary guarantees was fully predicated upon the net inflow of new money, the fortunes of the participants were inextricably intertwined. As long as the privileged company continued to receive net capital infusions, existing shareholders could dip into the well of funds to draw out their profits or collect their commissions. But all of them shared the risk that new participants would not emerge, cash flow would dry up, and the underlying pool would empty.

SG's most perfervid argument against a finding of horizontal commonality consists of a denial that its operations comprise a Ponzi or pyramid scheme. It says that any such scheme requires a material misrepresentation of fact and some element of fraud or deception, and adds that those additional features are lacking here; to the contrary, the rules of StockGeneration were fully and accurately disclosed to all participants. We do not gainsay that considerable disclosure occurred. SG emphasized that new participants constituted the sole source of all financial income for its StockGeneration

-24-

website.[4]  Indeed, in describing the structure and mechanism of its virtual stock exchange, SG drew a colorful analogy between the privileged company's shares and an enormous card table with a mountain of money.  According to SG, thousands of participants continuously threw money onto the table by purchasing shares in the privileged company, while other participants simultaneously sold their shares back to the exchange to retrieve their winnings from the table.  SG remarked that the system would remain stable so long as the size of the mountain either remained constant or continued to grow.

Despite the fact that SG was relatively candid in pointing out the fragile structure of the venture, its argument lacks force.  Even if we assume, for argument's sake, that misrepresentations of fact and badges of fraud are necessary for the existence of a Ponzi or pyramid scheme, the SEC's complaint contains allegations sufficient, as a matter of pleading, to establish both elements.  First, the complaint alleges that SG materially misrepresented the nature of the enterprise by concealing the fact that the supply of new participants inevitably would be exhausted, causing the scheme to implode and

_____

[4]SG specifically addressed this issue on its website, declaring that:  "New players:  that is the only source of all financial income to any game.  It does not and cannot have other sources of income.  Otherwise, the game becomes unprofitable and therefore simply pointless."

all existing participants to lose their money.[5]  Second, the SEC's complaint plausibly characterized SG's flat guarantee of a 10% monthly return on the privileged company's shares and its assurances that it would support those shares as material misrepresentations of fact.  Third, the SEC alleged that SG deceived participants by failing to disclose its intent to keep investor money for itself.

Of course, given its "this was only a game" defense, SG may well have colorable arguments anent materiality and reliance (i.e., that, based upon its explicit disclosures, no reasonable investor should have been deceived or misled).  But it is not this court's place to resolve such fact-sensitive questions in the context of a Rule 12(b)(6) motion for dismissal.  See Cruz v. Melecio, 204 F.3d 14, 21-22 (1st Cir. 2000).  For present purposes, it is enough that the SEC's

_____

[5]As the SEC points out, SG specifically represented on its website that SG was not a pyramid scheme that would "collapse inevitably as soon as the inflow of new players stops."  It went on to state:

> This is not a pyramid.  The similarities are purely superficial here.  A whale might look like a fish, but there are millions of years of evolution between the two.  The main fundamental difference is the lack of critical points in time, namely those of mass payments.  By manipulating profit, an optimal way of spreading them in time is successfully found.

allegations, taken as true, satisfy the common enterprise component of the Howey test.[6]

C. **Expectation of Profits Solely From the Efforts of Others**.

The final component of the Howey test — the expectation of profits solely from the efforts of others — is itself divisible. We address each sub-element separately.

1. **Expectation of Profits**. The Supreme Court has recognized an expectation of profits in two situations, namely, (1) capital appreciation from the original investment, and (2) participation in earnings resulting from the use of investors' funds. Forman, 421 U.S. at 852. These situations are to be contrasted with transactions in which an individual purchases a commodity for personal use or consumption. Id. at 858. The SEC posits that SG's guarantees created a reasonable expectancy of profit from investments in the privileged company, whereas SG maintains that participants paid money not to make money, but,

---

[6]If more were needed — and we doubt that it is — SG's promise to divert a portion of profits from website operations to support share prices if the need arose also warrants a finding of horizontal commonality. Through this arrangement, SG provided participants with the opportunity to share income derived from website operations on a pro rata basis. The SEC's complaint notes these facts and alleges in substance that a percentage of participants' funds were pooled; that participants were told of their entitlement to support from this monetary pool; and that they collectively stood to gain or lose (depending on whether they received the guaranteed return on their shares). In and of themselves, these averred facts boost the SEC across the legal threshold for horizontal commonality.

rather, to acquire an entertainment commodity for personal consumption. Relying heavily on Forman, the district court accepted SG's thesis. SEC v. SG Ltd., 142 F. Supp. 2d at 130-31. We do not agree.

In Forman, apartment dwellers who desired to reside in a New York City cooperative were required to buy shares of stock in the nonprofit cooperative housing corporation that owned and operated the complex. Based on its determination that "investors were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments," the Forman Court held that the cooperative housing arrangement did not qualify as a security under either the "stock" or "investment contract" rubrics. Id. at 853. The Court's conclusion rested in large part upon an Information Bulletin distributed to prospective residents which stressed the nonprofit nature of the cooperative housing endeavor. Id. at 854 (emphasizing that "[n]owhere does the Bulletin seek to attract investors by the prospect of profits resulting from the efforts of the promoters or third parties").[7]

_____

[7]The Court reiterated this conclusion in dismissing the possibility that the co-op would lease commercial facilities, professional offices, parking spaces, and communal washing machines. Noting that the Information Bulletin made no reference to the prospect of any such income as a means of offsetting rental costs, the Court concluded "that investors were not attracted to Co-op City by the offer of these potential

-28-

We think it noteworthy that the <u>Forman</u> Court contrasted the case before it with <u>Joiner</u>. In that case, economic inducements made by promoters in conjunction with the assignment of oil well leases transformed the financial instrument under consideration from a naked leasehold right to an investment contract. 320 U.S. at 348. The <u>Joiner</u> Court found dispositive advertising literature circulated by the promoters which emphasized the benefits to be reaped from the exploratory drilling of a test well. <u>Id.</u> ("Had the offer mailed by defendants omitted the economic inducements of the proposed and promised exploration well, it would have been a quite different proposition.").

The way in which these cases fit together is instructive. In <u>Forman</u>, the apartment was the principal attraction for prospective buyers, the purchase of shares was merely incidental, and the combination of the two did not add up to an investment contract. 421 U.S. at 853. In <u>Joiner</u>, the prospect of exploratory drilling gave the investments "most of their value and all of their lure," the leasehold interests themselves were no more than an incidental consideration in the transaction, and the combination of the two added up to an investment contract. 320 U.S. at 349. This distinction is

rental reductions." <u>Forman</u>, 421 U.S. at 856.

crucial, see Forman, 421 U.S. at 853 n.18, and it furnishes the beacon by which we must steer.

Seen in this light, SG's persistent representations of substantial pecuniary gains for privileged company shareholders distinguish its StockGeneration website from the Information Bulletin circulated to prospective purchasers in Forman. While SG's use of gaming language is roughly analogous to the cooperative's emphasis on the nonprofit nature of the housing endeavor, SG made additional representations on its website that played upon greed and fueled expectations of profit. For example, SG flatly guaranteed that investments in the shares of the privileged company would be profitable, yielding monthly returns of 10% and annual returns of 215%. In our view, these profit-related guarantees constitute a not-very-subtle form of economic inducement, closely analogous to the advertising representations in Joiner. In the same way that the prospect of profitable discoveries induced investors to buy oil well leases, the prospect of a sure-fire return lured participants to buy shares in the privileged company (or so it can be argued).

This is not to say that SG's gaming language and repeated disclaimers are irrelevant. SG has a plausible argument, forcefully advanced by able counsel, that no participant in his or her right mind should have expected

-30-

guaranteed profits from purchases of privileged company shares. But this argument, though plausible, is not inevitable. In the end, it merely gives rise to an issue of fact (or, perhaps, multiple issues of fact) regarding whether SG's representations satisfy <u>Howey</u>'s expectation-of-profit requirement.

       **2.** **<u>Solely from the Efforts of Others</u>.** We turn now to the question of whether the expected profits can be said to result solely from the efforts of others. The courts of appeals have been unanimous in declining to give literal meaning to the word "solely" in this context, instead holding the requirement satisfied as long as "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." <u>Turner Enters.</u>, 474 F.2d at 482; <u>accord</u> <u>Rivanna Trawlers Unlimited</u> v. <u>Thompson Trawlers, Inc.</u>, 840 F.2d 236, 240 n.4 (4th Cir. 1988) (adopting this holding and listing eight other circuits which have held to like effect). This liberal interpretation of the requirement seemingly comports with the Supreme Court's restatement of the <u>Howey</u> test. <u>See</u> <u>Forman</u>, 421 U.S. at 852 (explaining that "the touchstone is the presence of an investment in a common venture premised on a reasonable

expectation of profits to be derived from the entrepreneurial or managerial efforts of others").[8]

We need not reach the issue of whether a lesser degree of control by a promoter or third party suffices to give rise to an investment contract because SG's alleged scheme meets the literal definition of "solely." According to the SEC's allegations, SG represented to its customers the lack of investor effort required to make guaranteed profits on purchases of the privileged company's shares, noting, for example, that "playing with [the] privileged shares practically requires no time at all." SG was responsible for all the important efforts that undergirded the 10% guaranteed monthly return. As the sole proprietor of the StockGeneration website, SG enjoyed direct operational control over all aspects of the virtual stock exchange. And SG's marketing efforts generated direct capital investment and commissions on the transactions (which it pledged to earmark to support the privileged company's shares).

SG's payment of referral bonuses to participants who introduced new users to the website does not require a different result. Even if a participant chose not to refer others to the StockGeneration website, he or she still could expect, based on

_____

[8]We caution, however, that the <u>Forman</u> Court explicitly reserved judgment on adoption of the <u>Turner Enterprises</u> formulation. <u>See</u> 421 U.S. at 852 n.16.

-32-

SG's profit-related guarantees, to reap monthly profits from mere ownership of the privileged company's shares. Accordingly, the SEC's complaint makes out a triable issue on whether participants expected to receive profits derived solely from the efforts of others.

## IV. CONCLUSION

We need go no further. Giving due weight to the economic realities of the situation, we hold that the SEC has alleged a set of facts which, if proven, satisfy the three-part Howey test and support its assertion that the opportunity to invest in the shares of the privileged company, described on SG's website, constituted an invitation to enter into an investment contract within the jurisdictional reach of the federal securities laws. Accordingly, we reverse the order of dismissal and remand the case for further proceedings consistent with this opinion. The preliminary injunction and asset freeze shall remain in force pending conclusion of the proceedings below.

**Reversed and remanded.**

Securities Act of 1933 § 2(a)(1), 15 U.S.C. § 77b(a)(1):

> The term "security" means any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

Securities Exchange Act of 1934 § 3(a)(10), 15 U.S.C. § 78c(a)(10)

The term "security" means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.